## IN THE TENNESSEE COURT OF CRIMINAL APPEALS

## AT NASHVILLE

## MAY 1997 SESSION

**FILED**

March 18, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9606-CC-00236** |
| | ) | |
| Appellee, | ) | **MAURY COUNTY** |
| | ) | **(Transferred from Giles County)** |
| VS. | ) | **Nos. 7040 and 7041 Below** |
| | ) | |
| | ) | **The Honorable Jim T. Hamilton** |
| **PAT BONDURANT,** | ) | |
| | ) | **(First-Degree Murder, Arson)** |
| Appellant. | ) | |

FOR APPELLANT:

(On Appeal and Motion for New Trial)
William P. Redick, Jr.
P.O. Box 187
Whites Creek, TN 37189

Peter D. Heil
866 Battery Lane
Nashville, TN 37220

(At Trial)
Jerry C. Colley
John Colley
Colley & Colley
P.O. Box 1476
Columbia, TN 38402-1476

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter

Darian B. Taylor
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0485

T. Michael Bottoms
District Attorney General

James C. Sanders
Assistant District Attorney General

James G. White, II
Assistant District Attorney General
P.O. Box 1619
Columbia, TN 38402-1619

OPINION FILED:  _____

**AFFIRMED**

**CURWOOD WITT**
Judge

**O P I N I O N**

In this capital case, the defendant, Pat Bondurant, was convicted by a jury of first-degree premeditated murder and arson. At a separate sentencing hearing, the jury found the following aggravating factors: (1) the defendant was previously convicted of one or more felonies involving the use or threat of violence, and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. See Tenn. Code Ann. § 39-2-203(i)(2) and (5) (1982). The jury found that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and sentenced the defendant to death by electrocution.[1]

After the defendant filed a motion for new trial, counsel was allowed to withdraw and new counsel was substituted so that the issue of ineffective assistance of counsel could be raised. After a full hearing, the trial court entered an order denying the defendant's motion for new trial, and a notice of appeal was filed.

In this appeal, the defendant raises numerous issues that challenge the sufficiency of the evidence, the effectiveness of counsel, and that allege errors occurring during the guilt phase and during the sentencing phase of the trial. Having carefully considered the defendant's contentions as to the sufficiency of the evidence and as to errors occurring during both the guilt and the sentencing phases, and having decided that none affirmatively appear to have affected the verdict, we affirm the defendant's convictions.

**BACKGROUND**

At the guilt phase, the state presented the testimony of the defendant's wife, Denise Bondurant. Denise married the defendant in 1983, but they separated in August 1986 after a fight, during which the defendant had Denise, who was pregnant, on the floor,

---

[1]At a separate hearing, the trial court sentenced the defendant for his arson conviction as a Range II offender to ten years to run consecutive to his sentence of death.

2

choking and hitting her, and holding a gun to her head. Denise's older sister broke up the fight, and Denise went to live with her in Athens, Alabama, for two months.

At the time, Denise had one child, Matthew, who was three years old and had cerebral palsy. In 1986, the defendant received Matthew's disability check from Social Security at a farmhouse in Elkton, Tennessee, where he and Denise had previously lived together. Denise and the defendant maintained some contact after the separation, and the defendant would give Denise the cash from Matthew's check each month. Because Denise did not work, she would call the defendant whenever she needed money.

In September 1986, Denise asked the defendant for money to help her move to Pulaski, and he told her that his wallet had been stolen the night before while he and the victim had been out drinking. The defendant assumed the victim had taken the wallet, which contained that month's disability money for Matthew.

In October 1986, Denise returned to Pulaski after Matthew's monthly check arrived, and she rented an apartment. On the day Denise picked up the money from the defendant, he made further remarks about the wallet being taken. The defendant indicated how embarrassed he was and how no one steals anything or takes anything from him or "little Matthew."

On Saturday, October 18, 1986, Denise needed more money from the defendant. She looked for the defendant at the victim's house, but no one was home. She then went to the Pulaski Rubber Company, where the defendant worked, because he was to be there by 11 a.m. to work overtime. After learning the defendant was not coming to work until 3 p.m., she returned to the Pulaski Rubber Company around 2:30 p.m. and waited for the defendant to arrive. The defendant arrived around 2:45 p.m., driving his old white Plymouth or Dodge. The defendant parked his car next to Denise's car, and she noticed blood smeared on the rear fender of the passenger's side. When Denise asked the defendant about the blood, he instructed her to sit in the car and act like she was sick

3

while he ran into the plant to wet some paper towels.  The defendant returned with the paper towels and handed part of them to Denise.  He told her to start wiping her face.  While Denise did this, the defendant wiped the blood off of his car.

In explaining the discovered blood, the defendant told Denise that the night before, he and the victim had been playing cards at the victim's house when the defendant caught the victim cheating.  Both men were drinking quite a bit, and when the defendant started thinking about his wallet being stolen, about Matthew's money being taken, and about the victim cheating, the defendant just "went off" on the victim and started beating him with a small rocking chair that was in the victim's house.  The defendant told Denise that he continued beating the victim and telling him no one steals from "little Matthew" thirty minutes after the victim was dead.  He also told Denise that only a small piece of the rocking chair was left when he stopped.  Afterwards, the defendant put the victim's body in the bathtub and called Mark Marrow at the Shady Lawn Truck Stop in Elkton and asked him to go across the street to the farmhouse and get Pete Bondurant, the defendant's identical twin brother.  Pete came to the victim's house and assisted the defendant in cutting up the body in the victim's bathtub.

The defendant told Denise that he and Pete cleaned the bathtub and poured Drano down the drain in case there was any loose hair or blood.  Then the defendant and Pete loaded the body and took it to Westpoint, Tennessee, where the defendant's parents had a house.  The defendant and Pete burned the body on the property approximately five feet outside the back door of their parents' house.  Because Denise had pointed out the blood on the car, the defendant told her she was entitled to one-third of the burial

expenses, meaning any money found on the person at the time of the murder.  Denise noticed that one of the twenty dollar bills the defendant gave her had blood on it.

Denise saw the defendant later that night when he came to her apartment

4

to take a bath. The defendant left around 12:30 or 1:00 a.m. to go to Westpoint because he had work to do there. Denise again saw the defendant on the afternoon of Sunday, October 19, 1986, at the farmhouse in Elkton. The defendant, Pete, and their friend Rodney Randolph, were at the house when Denise arrived. All three were on the front porch drinking and using narcotics. When Denise first walked up on the porch, the defendant pointed to a corner of the yard and said "that's what's left of Hippy." (The victim's nickname was "Hippy.") In the direction where the defendant was pointing, Denise saw a big round lump smoking in the yard. The victim's body had been moved from Westpoint to Elkton because the defendant and Pete became paranoid and wanted to be close to town where they could hear any news concerning the victim's disappearance.

The defendant explained to Denise that to burn the body, they had to get the temperature very hot and that he had used rubber from work. She testified that it took two and a half days to burn the body. When questioned about why the body was smoking after only one and a half days, Denise testified that she had already witnessed one burning before that took two and a half days, referring to the Dugger murder.[2] Denise was allowed to testify that in the prior case, the body had not been cut up before it was burned.

That afternoon, Denise stayed at the farmhouse between 30 minutes to an hour. The four of them then went to the Tennessean Truck Stop. At the defendant's request, Denise called the Pulaski Rubber Company and pretended to be Joyce Gaines, the victim's wife, and reported the victim off from work until Tuesday. The four then went to a hospital in Lewisburg, Tennessee, where Randolph used Pete's Medicaid card to see a doctor and obtain a prescription. Denise then took the three men back to Elkton. When asked why she did not leave earlier, Denise testified that she was afraid, just as she had been when Dugger was killed.

---

[2]In May 1991, the defendant and his brother Pete were convicted in Giles County of second-degree murder for the killing of Gwen Dugger. See State v. Kenneth Patterson (Pat) Bondurant and Hugh Peter (Pete) Bondurant, No. 01C01-9501-CC-00023 (Tenn. Crim. App., Nashville, May 24, 1996), perm. app. denied, concurring in results only (Tenn. 1996).

Christopher Johns, a security guard at the Pulaski Rubber Company, confirmed that he received a call on Sunday, October 19, 1986, from someone purporting to be the victim's wife. Johns took a message and laid it on the foreman's desk. On October 20, at approximately 12:50 p.m., Tommy Hodge, the office manager at Pulaski Rubber Company, received a telephone call from someone purporting to be the victim. Hodge told the person to hold while he transferred him to the plant manager; however, the person hung up. In Hodge's opinion, the person on the phone was not the victim, and a note was placed in the victim's file. According to the victim's time card, the last day he worked was Friday, October 17, 1986. Although the victim was scheduled to work on Saturday, October 18, he did not show up. The victim was also absent from work the entire next week. The victim's last paycheck, dated October 17, was endorsed on the back with the signatures of the victim and the defendant. The check was cashed on the same date. The victim's final paycheck, dated October 24, was never picked up.

On Wednesday, October 22, the victim's house burned. The next day, Denise went to the Pulaski Rubber Company during the defendant's dinner break to ask for more money. The defendant asked if she knew about the victim's house burning. The defendant suggested Denise should drive by to see the house, which she did.

Later that night, around 10:45 p.m., Denise went back to the Pulaski Rubber Company to pick up the defendant. While she was waiting, Pete showed up. When the defendant came out, Pete told Denise how he took a candle and set it in the middle of the bed in the front bedroom of the victim's house. He put sheets around the lower part of the candle so that when the candle burned down, the sheets would catch on fire, giving Pete time to get away before the fire ignited. The three of them drove by the victim's house, and the defendant said that the victim got what was coming to him. The defendant, however, had been at work when the fire started.

Joyce (Gaines) Spurgeon testified that she was married to the victim at the

6

time of his disappearance. On October 11, 1986, Spurgeon and her daughter Loretta Teeples left the victim after a fight and went to live with Spurgeon's other daughter. Spurgeon went back to the house to get some clothes for her daughter on the morning of October 20. When Spurgeon opened the door to her daughter's bedroom at the front of the house, she noticed the carpet had been cut around the furniture and only the foam padding was left. Spurgeon also noticed that an electric blanket was spread out at the foot of the bed. Spurgeon became frightened, so she took some of her daughter's clothes and left the house.

Later that evening, Spurgeon returned to the house with both daughters to pick up more clothes. Spurgeon and Loretta noticed that the phone in the living room was missing. Loretta testified that there were "beer cans and stuff everywhere." They also noticed that the comforters from the master bedroom and from Loretta's bedroom were missing. Loretta testified that the carpet in her room had been cut out around the furniture, the bed looked slept in, and a blanket was at the foot of the bed. A wooden jewelry box, her bedspread, and a small black and white television were missing from Loretta's room. Neither Spurgeon or Loretta noticed any blood or signs of a fight.

Although Loretta did not include it in her statement to William E. Coleman, a special agent with the Tennessee Bureau of Investigation ("T.B.I."), and did not notice it on October 22, 1986, she testified that there had been a small rocking chair in her room. She had not seen the rocking chair since she left home on October 11, 1986.

Ann McGill, the victim's sister, testified that she went to the victim's house the morning after the fire to see if the victim needed help. McGill went in the front door, but the victim did not answer when she called. The house was in disarray, the victim's boots, which he always wore, were sitting at the end of his bed, and his snuff was sitting on the table. McGill did not see any blood.

Following the victim's disappearance, Spurgeon was granted a divorce on

7

grounds of desertion for a period of one year preceding the filing of the action. Spurgeon never saw or heard from the victim after she left him on October 11, 1986.

Frank Collins, the Pulaski Fire Chief, received a call at 11:47 p.m. on October 22, concerning the victim's house being on fire. Flames were coming out of a bedroom window located on the left front part of the house. The fire was put out before it spread to the rest of the house; however, the other rooms were charcoaled from the smoke. Collins believed the fire started in the bed located in the front bedroom.

Lane Roberts, detective sergeant for the Pulaski Police Department, investigated the fire at the victim's residence and the victim's disappearance. The victim was reported missing at 9 p.m. on October 23, after the fire. Roberts became involved in the case on October 24. From his investigation, Roberts determined that the last person to see the victim alive was the defendant on October 17. Roberts was unable to substantiate any alleged sighting of the victim after that date.

In his initial statement to Roberts, the defendant said he took the victim, who was drunk, home on October 17, after they got off work at 11 p.m. The defendant said he then stopped by the Corner Canteen and went home to Elkton. On October 28, the defendant gave Roberts a similar statement. The defendant added that he, Denise, and the victim went to the bank together on Thursday, October 16 to cash the victim's check; however, the returned check was dated October 17 and had been cashed on the same day. The defendant also told Roberts that he went looking for the victim at his house on October 22, the day of the fire, but was unable to find him.

Jerry Dickey, an arson investigator with the State Fire Marshall's Office, was in charge of the Fire Marshall's investigation of the fire at the victim's residence. From his investigation, which began November 3, he ruled out any accidental causes and determined that the origin of the fire was in or around the bed in the front bedroom. The fire appeared to have lasted 45 minutes to an hour before being discovered. The call

8

reporting the fire was made at 11:47 p.m., and Dickey estimated that the fire started between 10:47 and 11:02 p.m.

As part of their joint investigation, Dickey and Roberts interviewed several people, including Denise and the defendant. Denise told them that the defendant came over to her apartment immediately after work on October 17 and did not leave until 2:00 or 3:00 a.m., if at all, on October 18. During their interview with the defendant, he gave the following statement:

> On 10-17-86 me and Denise went over to use the phone at Ronnie's house to call Columbia, to get a phone put in Denise's apt C-8 Country Side Village, I left my car at Ronnie's which is a 1964 Ply Fury white Denise took me and Ronnie to town First National Bank an then back to Ronnie's house, Ronnie and I left in my car and went to Dixie Food got a plate for supper and brought to work with us, we also went to Wall Mart, where I bought some toiletries,

> After ward on 10-17-86 I left, Ronnie left with me we went to Village Market I bought a cold drink and Ronnie bought a cross-word puzzle book. I let Ronnie out at his house and I went to Western Lounge, it was band night.

> After leaving the Western Lounge I went to West Point in Lawrence Co. I stayed with my brother Pete on the 18th of Oct I called in that I would be late. Ronnie did not report to work that night.

> On 10-19-86 I was off work. On 10-22-86 I went by Ronnie's house before work I stopped in and Ronnie was not at home or at least he did not answer when I called out for him, I did not go past the kitchen.

The defendant admitted he had not gone home that night to Elkton. Instead, the defendant said that he met Terri Lynn Clark, his girlfriend, at the Western Lounge on October 17 and took her to the house in Westpoint where he and his brother Pete had sex with her. The defendant asked Dickey not to write this in the report because he did not want his wife to find out. Dickey agreed not to write it down but advised the defendant he would have to verify the defendant's story with Clark. Dickey attempted to talk with Clark on November 17; however, when he found her at the farmhouse in Elkton, she was dead. He did not testify as to the cause of her death.

When the victim's house burned down, the defendant told Carmen Woods,

9

a co-worker, that he thought the victim "had burnt the house himself and run off." A few months later, a newspaper was laying on the table in the break room, and the defendant and Woods started looking at an article concerning the victim's disappearance. The defendant stated that anybody who would steal from Matthew would never steal again and that he would make it where the family could not receive the insurance money if they were unable to find the body. Then the defendant started to walk off but turned around and said "yeah, I killed the son of a bitch." Woods described the defendant as "jittery" when he said this. The defendant told Robert Kelton, another co-worker, there "wasn't no S.O.B. going to steal his crippled son's welfare check and get by with it."

After the defendant's wallet was stolen, the victim started riding home from work occasionally with Jeffrey Strickland, a co-worker at the Pulaski Rubber Company. Shortly before the victim disappeared, the defendant told Strickland that he and Pete were going to catch him and the victim and pull the victim out of Strickland's car. After the victim disappeared, Strickland heard the defendant comment that the victim had joined the Foreign Legion.

Approximately a month before the victim disappeared, William Wade Bass saw the defendant and the victim at the Western Lounge. Bass noticed a wallet on the floor and picked it up. Outside the bar, Bass realized the wallet belonged to the defendant, but he took the cash and cashed a check which was already endorsed.

In the Spring of 1987, Denise and the defendant went to the house in Westpoint to cut the grass for the defendant's parents while they were away. While cleaning up the backyard, the defendant found a four-inch bone at the spot where he had burned the victim's body. When they left, the defendant took the bone and threw it out the window while driving down Westpoint Highway.

In February 1990, Denise talked to the authorities about the victim's murder. During this time, Denise continued to see the defendant, and the defendant stayed with her

10

two nights a week. Denise gave a written statement to T.B.I. Special Agent Coleman on May 1, 1990. After that, Denise had several meetings with the district attorney's office and with police authorities, although some of the meetings concerned other cases.

Denise admitted that she had lied in her previous statement to Dickey and Roberts in order to protect the defendant. Denise indicated that she waited to talk to authorities because she was afraid of the defendant and Pete after the Dugger murder. Denise testified that she had been told if she went to any law enforcement officials about what happened to Dugger, the defendant and Pete would blame the whole thing on her. The defendant asked Denise if she wanted to have her baby in prison and asked who she thought the authorities would believe. Denise did not file for divorce from the defendant until June 1990, after the defendant was arrested. She explained that there was no point in filing for divorce sooner because the defendant had told her "united we stand and divided we fall." On redirect, Denise explained that the defendant's statement meant that as long as the three of them stood together, nobody would go to jail; however, if one of them were to fall, all would go to jail.

On cross-examination, Denise admitted she had disobeyed a court order allowing the defendant's parents visitation of their grandchild and that a contempt petition had been filed against her. Denise also admitted that she had used drugs, only stopping while she was pregnant, and then starting up again until the defendant's arrest.

After taking Denise's statements on May 1, 1990, Agent Coleman obtained a warrant to search the residence in Westpoint for bone fragments or any other human body parts. On May 8, Agent Coleman went to the residence with a team of forensic anthropologists and the State Fire Marshall's Office. After the Fire Marshall's trained accelerant detection dog alerted on an area determined to be the spot described by Denise, the anthropologist began digging. Denise, who arrived later, confirmed that the anthropologists were digging where the defendant said he burned the body. The presence of evaporated kerosene was identified in one of the soil samples taken from the location.

11

Dr. William M. Bass, head of the anthropology department at the University of Tennessee, was in charge of the excavation at the Bondurant property in Westpoint. Their excavation revealed burned human cranial fragments mixed with charcoal and burned soil. Dr. Bass found seven cranial bone fragments that were large enough to make positive identifications. While the other bone fragments were too small to positively identify the area of the skull they came from, he was certain that they were human skull fragments. From studying the larger fragments, Dr. Bass testified that the bones appeared to have been broken before being burned, and that the irregular broken edges suggested that blunt trauma had occurred. He was more than 50% certain that some force had been applied to the skull before it was burned. Moreover, based on the thickness of six larger fragments that could be measured, Dr. Bass was 75% certain that the bones were from a human male, and he was 90% certain that the bones had been there one to fifteen years.

Several witnesses testified on behalf of the defense. Kathrine McCloskie, the victim's neighbor, testified that she saw the victim mowing his yard on Monday, October 20, 1986. McCloskie also saw a 200-pound man in an old white car drive up to the victim's house around 5 p.m. on the day of the fire. The man went into the house, stayed a few minutes, and then left. In rebuttal, Detective Roberts testified that after talking with McCloskie on October 26, 1986, he walked over to the victim's yard to look at the grass and decided that it was too high to have been cut on October 20. Charles "Buster" Stanford visited his grandmother, who lived across the street from the victim's house, at least once a day. He testified that he saw the victim standing out on the street with a brown paper sack around 2:00 or 3:00 p.m. one day during the week of the fire.

Mark Marrow worked at the Shady Lawn Truck Stop across the street from where the defendant and Pete lived in Elkton. He did not recall taking any messages to the defendant or to Pete, and he never gave either of them a ride to Pulaski. However, during an earlier interview with Agent Coleman in November of 1991, Marrow admitted that he had received calls from one of the twins asking him to get a message over to the other at the farmhouse. When talking to Agent Coleman, Marrow remembered delivering such

messages on various occasions. He also remembered on at least one occasion giving one of the twins a ride to Pulaski, although he did not remember doing so on October 17, 1986.

Rodney Randolph testified that he had no recollection of seeing or having a conversation concerning a smoking or burning lump in the yard at Elkton. Randolph also denied having ever been treated at the Lewisburg Community Hospital. On cross-examination, Randolph testified that in 1986, he lived with the twins at Elkton during the week, but he stopped staying there after Terri Lynn Clark was found dead in the house. After the victim disappeared, Randolph heard the defendant jokingly say that the victim had joined the French Foreign Legion. Randolph told Agent Coleman that Denise had called someone in sick, but he did not know who or when that was. The defendant told Randolph if you cut a body up in pieces and scatter it over four or five states, it would be hard to make a case because there would be no body.

In the Fall of 1986, Travis Tidwell checked on the elder Bondurants' house in Westpoint every week to two weeks while they were out of town. Because he had once been burglarized when he had owned the house, Tidwell would drive up and circle around to the back, paying close attention to the back door area. During that time, Tidwell never saw anything burning or smoking or any sign that something had been burned.

The defendant, who was 36 years old at the time of the trial, testified on his own behalf. Since December 3, 1973, he had worked with the victim at the Pulaski Rubber Company making rubber flooring for school buses. The defendant testified that he and the victim were good friends. Shortly before the victim disappeared, the defendant even co-signed a note for the victim so he could buy furniture.

The last time the defendant saw the victim was on October 17, 1986, when he took him home after work at 11 p.m. While the defendant did not remember that particular night, their usual routine was to go to the store after work, and then the defendant would take the victim home. Afterwards, he would go to the Western Lounge

13

(called the Corner Canteen for a short period of time) until it closed at midnight. The defendant thought he went to Westpoint that night. The next day, the defendant was to be at work at 11 a.m.; however, he overslept and did not call in late until 12:17 p.m., based on his mother's phone bill from Westpoint.

The defendant denied killing the victim, stating that he did not have a reason to be angry with him at that time. The night he lost his wallet, the defendant went to the victim's house to look for it and to confront the victim, but he was satisfied that the victim did not have it. A week later they were back to riding and drinking together.

The defendant went by the victim's house on the afternoon of the fire to make the victim go to work so he would not be fired. The defendant called out for the victim, but no one answered. The defendant saw the fire when he left the Western Lounge that night but did not stop because he had been drinking. For the most part, the defendant could not remember what he said to investigators and denied making incriminating statements to Denise or to his co-workers.

Based on this evidence, the jury found the defendant guilty of first-degree murder and arson.

At the sentencing hearing, the state introduced the judgment document as proof of the defendant's conviction of second-degree murder for the death of Gwen Dugger in 1991. As to the heinous, atrocious, and cruel aggravating factor, the state relied on the proof at the guilt phase.

The defense presented the testimony of the defendant's mother. The defendant's father was unable to testify because of his health. Mrs. Bondurant worked for

14

the Department of Army for twenty-nine years and six months. Because of the defendant's arrest, Mrs. Bondurant had to retire in order to take care of her husband. Her last post was at Redstone Arsenal in Huntsville, Alabama. From 1984 to 1987, Mrs. Bondurant worked mostly in Germany. During this time, she would return to the United States once or twice a year, and her husband would return every three months.

While the Bondurants were out of town, their son Pete lived at the house, and the defendant lived there some too. For two of the years they were gone, the Bondurants rented the house to someone else. When out of the country, the Bondurants talked with the twins at the house in Westpoint almost every weekend.

The Bondurants moved back to Westpoint in September 1989. The defendant helped them wash windows, unpack boxes, move furniture in the house, and move furniture to Mrs. Bondurant's apartment in Huntsville. Mrs. Bondurant testified that the defendant worked regularly at the Pulaski Rubber Company for 17 years until the time he was arrested. She testified that the defendant was a good son and stayed with her ill husband at least three or four days a week, enabling Mrs. Bondurant to work. During the time Mrs. Bondurant was working in Huntsville, she normally stayed at her apartment Monday through Thursday and came home on weekends. Occasionally she would come home during the week.

From September to November of 1989 and from January to the first of April 1990, the defendant brought his son to see them on weekends and would spend the night. Mrs. Bondurant testified that they were a close and loving family. Mrs. Bondurant and her husband of 39 years had two other children, a married son with four children, who was a social worker in Delaware, and a married daughter in Lawrenceburg, Tennessee.

Based on this proof, the jury sentenced the defendant to death for the murder

of William Ronnie Gaines.

## I. JURY SELECTION

## A. Fair Cross-Section of the Community

First, the defendant argues that because of deviations from the mandated procedures in selecting the original jury venire, and because of the resulting prejudice to the integrity of the judicial process and the public's confidence in the administration of justice, this matter should be remanded for a new trial. In addition, the defendant argues that counsel was ineffective by failing to raise these objections before trial. We find no reversible error.

At the hearing on the motion for new trial, the defendant presented proof tending to show that the jury selection procedures employed in Maury County violated several provisions of Tennessee Code Annotated sections 22-2-101 to -309.[3]

---

[3]The defendant claims that the following practices employed by the trial court clerk substantially departed from the mandated statutory procedures. We cite to the statutes in effect at the time the jury venire was selected.

(1)    The jury commissioners, on their own initiative, excluded from service people with occupational exemptions. Tenn. Code Ann. §§ 22-1-103 (Supp. 1991) (amended 1993, 1996) and 22-1-106 (1980). See Cooper v. State, 847 S.W.2d 521, 523 (Tenn. Crim. App. 1992).

(2)    The jury box was routinely opened by unauthorized personnel. Tenn. Code Ann. §§ 22-2-301 and -302(c)(1) (Supp. 1991).

(3)    The names for the master jury list were not selected from each district in proportion to the population of such districts. Tenn. Code Ann. § 22-2-302(a)(1) (Supp. 1991) (amended 1993).

(4)    The trial court clerk failed to record the master jury list in a well-bound book and failed to keep such book under lock and key. Tenn. Code Ann. § 22-2-302(b) and (c)(2) (Supp. 1991).

(5)    Because there was no master jury list, the initials of the jury commissioner proposing each name did not appear. Tenn. Code Ann. § 22-2-302(b)(3) (Supp. 1991).

(6)    Names were placed on the master jury list without the required majority vote of the jury commission. Tenn. Code Ann. § 22-2-302(b)(3) (Supp. 1991).

(7)    The jury commissioners did not certify and preserve the master list. Tenn. Code Ann. § 22-2-302(b)(4) (Supp. 1991).

(8)    Because there was no master jury list, the names were not alphabetized and numbered according to law, and required information was not recorded by the trial court clerk on the uniform tickets placed in the jury box. Tenn. Code Ann. § 22-2-302(c)(1) (Supp. 1991).

There was proof that jury commissioners for Maury County were notified by the circuit court

---

(9)     The jury commissioners did not certify that the list of names drawn from the jury box was accurate. Tenn. Code Ann. § 22-2-304(a)(5)(A) (Supp. 1991).

(10)    The trial court did not spread the names of those drawn from the jury box upon the court minutes, along with the certification by a majority of the jury commissioners that the list of names was accurate. Tenn. Code Ann. § 22-2-304(a)(5)(A) (Supp. 1991).

(11)    The original tickets drawn from the jury box were not placed in a sealed envelope bearing the signatures of the jury commissioners over such seal and delivered to the trial court. Tenn. Code Ann. § 22-2-304(d)(1) and (2) (Supp. 1991).

(12)    The trial court clerk neither prepared, delivered to the court, nor retained a copy of a report, signed by the jury commissioners, that listed the numbered and initialed names drawn from the jury box. Tenn. Code Ann. § 22-2-304(d)(1) (Supp. 1991).

(13)    The trial court clerk neither prepared nor delivered a report to the trial court that listed the names of persons who were drawn from the box but were known to have died, removed from the county, or had become mentally or physically disabled from jury service. Tenn. Code Ann. § 22-2-304(d)(1) (Supp. 1991).

(14)    The trial court clerk failed to carefully preserve the original tickets that contained the names of the jurors excused by the court and failed, at the next meeting of the jury commission, to place these tickets back in the jury box before the next drawing. Tenn. Code Ann. § 22-2-304(d)(3) (Supp. 1991).

(15)    The trial court clerk did not note in the jury book, next to the names of those persons known to have died or to have become disabled, the reasons given in the jury commission's report why such jurors were unable to serve. Tenn. Code Ann. § 22-2-304(d)(3) (Supp. 1991).

(16)    The trial court clerk failed to safely keep and file the jury commission's reports to the trial court. Tenn. Code Ann. § 22-2-304(d)(4) (Supp. 1991).

(17)    The trial court clerk did not swear the sheriff to secrecy regarding the names of the jurors to be summoned to appear for jury service. Tenn. Code Ann. § 22-2-305(a) (Supp. 1991).

(18)    The trial court clerk did not properly issue the state's writ of venire facias to the sheriff, and the sheriff neither properly received nor returned such venire facias. Tenn. Code Ann. § 22-2-305(a) (Supp. 1991).

(19)    Persons summoned as jurors were illegally excused from service by members of the trial court clerk's office, without the required showing being made to the trial court. Tenn. Code Ann. §§ 22-2-307(a) and -308(d) (1980).

(20)    Neither the trial court clerk nor the trial court caused a scire facias to be issued and served on persons who were summoned for jury duty but who failed to appear, requiring those persons to show cause why they should not be held in contempt and fined for such failure to appear. Tenn. Code Ann. § 22-2-307(b) (1980).

(21)    Because no writs of scire facias were issued, the trial court failed to examine those persons served with a scire facias as to the sufficiency of their excuse and failed to hold those persons with insufficient excuse in contempt of court. Tenn. Code Ann. § 22-2-307(c)(1980).

(22)    The trial court failed to compare, in open court, the list contained in the jury commission's report with the original tickets contained in the jury commission's sealed envelope and to spread the result of such comparisons and the jury commission's report onto the record in the caption of the minutes. Tenn. Code Ann. § 22-2-308(a)(1) (1980).

(23)    The jury commissioners failed to cause names to be drawn from the jury box by a child under 10 years of age or by a person securely blindfolded. Tenn. Code Ann. § 22-2-304(a)(1) (Supp. 1991).

(24)    The jury commissioners failed to remove the remaining names before replenishing the jury box. Tenn. Code Ann. § 22-2-309(a) (1980).

(25)    The trial court clerk improperly published a copy of the jury list prior to the actual summoning of the prospective jurors. Tenn. Code Ann. § 22-2-306(a) (Supp. 1991).

clerk's office when they needed names for the jury box. Each commissioner picked names from his or her districts at random from the voter registration books and sometimes from the telephone directory, trying to find people of each age, gender, and race, and people with good voting records. One commissioner also looked for persons who did not have criminal records. Tabs were only kept on the number of names picked from each district. If one of the commissioners knew that someone was a doctor, a nurse, an attorney, or a minister, the name would not be listed. The commissioners would write the names, addresses, and districts on a legal pad and give them to the circuit court clerk's office so the names and districts could be typed on slips of paper.

When names were drawn from the jury box, someone in the clerk's office would be blindfolded or would look away while drawing the names. The chairman of the jury commission then read out the districts, and another commissioner tallied the number of names from each district. The names were already in the jury box when the commissioners arrived for the drawing. If they knew that a person was dead or had moved away, that person's juror slip was set aside. Once the names were drawn, the commissioners did not make a list of the names, seal the list with the actual slips, or put them in an envelope to give to the trial court. Instead, the jury commissioners only certified the number of names drawn.

One jury commissioner remembered being sworn in when he was initially appointed; however, another jury commissioner did not remember taking an oath. Joe H. Scott, the circuit court clerk for Maury County at the time of this trial, testified that he did not take a separate oath of office as clerk for the jury commission. However, he testified the commissioners always took an oath upon reappointment. Scott testified there was no master list of all the names eventually put in the jury box; instead, the clerk's office had an attendance book with the names of people who reported for jury duty and were chosen by the court to serve as jurors. Contrary to the testimony of the commissioners, Scott testified that the commissioners put the names in the jury box. He confirmed that normally one of the deputy clerks would be blindfolded or would turn her back while drawing the names.

18

After the names were drawn, they would be divided into districts, and the clerks would type the summons list. Scott testified that the slips of paper with the names on them were put in an envelope and kept in the vault until there was no room for them, as were the summons lists. At the time of the hearing, the oldest jury cards left in the vault were from 1992.

Scott prepared the report of how many jurors were drawn on a specific day, and all three commissioners would then sign it. After the summons list was typed, a copy was placed on the bulletin board in the courthouse for public viewing, and the original was sent to the sheriff's office for service. If a summons letter was returned undelivered, the person's name was marked off. After two or three years, these letters were thrown away. When the vault was cleaned out periodically, the original juror tickets were thrown away. Scott testified that the court was not given a list of the names drawn from the jury box with the original tickets in a sealed envelope.

When a group of jurors reported for duty, roll was taken, and the names of jurors who did not answer were laid aside. The rest of the tabs were placed in a shoe box and handed to the judge. The bailiff took the jurors' information cards as they took their seats in the box. When the box was full, the bailiff returned the cards to Scott, who clipped and marked them by panel number. Then the cards were sent to the circuit court clerk's office so that the master list could be typed. If a juror brought a doctor's certificate, Scott removed his or her name from the list. Otherwise, the court decided whether someone should be excused.

After the names were drawn, people would call the clerk's office trying to avoid jury service. While some of the deputy clerks told them to bring a doctor's excuse on the day of service, others personally excused physicians, school teachers, persons over 65, and any professional people without asking for approval from the trial judge.

The sheriff of Maury County, who was never sworn to secrecy or served with a writ of venire facias, summoned jurors by regular mail based on the list sent from the clerk's office. Any notices returned because of insufficient address, wrong address, or because the juror had moved, were returned to the clerk's office. These potential jurors were never resummoned, nor was the sheriff instructed to bring them to court for failing to appear.

The defendant claims that the enumerated statutory violations require that his conviction be reversed without a showing of actual prejudice and the case be remanded for a new trial under State v. Lynn, 924 S.W.2d 892 (Tenn. 1996). We find that Lynn does not apply to the facts of this case. In Lynn, our supreme court held that a "flagrant, unreasonable, and unnecessary" deviation from the statutory special venire selection procedure, following the trial court's finding of jury tampering with the original venire, constituted reversible error even though the defendant was unable to demonstrate actual prejudice. Id. at 894.

In denying the defendant's claim as presented upon the motion for new trial, the trial court made the following findings:

> The Defendant next claims that his conviction should be set aside because Maury County officials departed in certain respects from the statutory procedure for selecting the petit jury voire [sic]. At the hearing on this matter, the Defendant asserted thirty-one purported statutory violations, all falling under Title 22, Chapter 2 of the Tennessee Code governing selection of jurors. Defendant is not entitled to relief on this claim despite the departure noted above, because Tennessee Code Annotated, see 22-2-213, specifically provided that in the absence of fraud, no irregularity with respect to any of those provisions shall affect the validity of any verdict rendered by a trial jury unless pointed out by the Defendant before the jury is sworn. In this case, I find no showing of fraud and this issue was first raised in this Motion. This issue is without merit and is overruled.

As cited by the trial court, Tennessee Code Annotated section 22-2-313 provides:

> In the absence of fraud, no irregularity with respect to the provisions of this part or the procedure thereunder shall affect the validity of any selection of any grand jury, or the validity of any verdict rendered by the trial jury unless such irregularity has been specially pointed out and exceptions taken thereto

20

before the jury is sworn.

Here, the defendant failed to take issue with the original venire before the jury was sworn. Accordingly, this issue was waived. Tenn. R. App. P. 36(a). Regardless, application of Lynn is limited to extraordinary circumstances which do not exist as to the original venire in the present case. Notably, in Lynn, without notice to either party, the trial court directed the court clerk to draw new names for a venire after it found evidence the original venire was tainted by jury tampering. The court clerk opened the jury box in his office, unsealed it, and drew sufficient names to constitute a special jury panel. Counsel was not supplied a list of the names until immediately before jury selection. Lynn, 924 S.W.2d at 894.

The supreme court found that the statutory requirements for selecting a special venire were totally disregarded after the original venire was tainted by jury tampering:

> [T]he statutes are explicit. The procedures required are detailed. This judicial proceeding had already been discolored by the trial judge's earlier findings of jury tampering. The fundamental principles of impartiality, disinterestedness, and fairness are even more essential in a case, such as this, in which a previous attempt to circumvent fairness has occurred.
>
> Often, the public sees in our justice system something substantially different from what actually exists. It is the appearance that often undermines or resurrects faith in the system. To promote public confidence in the fairness of the system and to preserve the system's integrity in the eyes of the litigants and the public, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 13, 75 S. Ct. 11, 13, 99 L.Ed.11 (1954).

Lynn, 924 S.W. at 898. Accordingly, absent extraordinary circumstances, as set out in Lynn, the defendant still has the burden of demonstrating prejudice from the failure to follow the technical procedures of Title 22. See State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993). In the present case, the defendant concedes that he is unable to show prejudice. We fail to find sufficient similarity between Lynn and the case at bar to warrant the extraordinary remedy afforded the defendant in Lynn.

Accordingly, the defendant's claim of ineffective assistance must also fail. When a defendant seeks relief on the basis of ineffective assistance of counsel, he must

21

first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). There must be a reasonable probability that but for counsel's error, the result of the proceeding would have been different. Id., 466 U.S. at 694, 104 S. Ct. at 2068; see Best v. State, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985). Should the defendant fail to establish either factor, he is not entitled to relief. Here, regardless of the technical violations in calling the original jury venire, the defendant has failed to show prejudice. Therefore, his claim of ineffective assistance is also without merit.

The defendant also argues that because of the deviation from the mandated selection procedure in selecting a special jury venire for this case and because of the resulting prejudice to the integrity of the judicial process and the public's confidence in the administration of justice, this matter should be remanded for a new trial.

When it became apparent that there would not be enough potential jurors to complete the panel in this case, the trial judge directed the court clerk to have more jurors called. The testimony was unclear as to who opened the jury box and drew the names, but it was evident that the jury commissioners did not, nor did the trial judge in open court. The deputy clerks then took the names that were drawn and looked up the phone numbers. If the address on a juror slip did not match the address in the phone book, the slip was set aside. Moreover, if the deputy clerk knew the person's work number, she would try to reach the person there. One deputy clerk testified that people called back in the afternoon to see if it was a joke because they had never been called to jury duty in this manner before. No master list was made of the names drawn or summoned, and nothing was done to those persons who did not respond.

Trial counsel objected to the special venire right before the jury was sworn.

22

In support of the motion, the defense presented the testimony of the circuit court clerk. After argument on the motion, the trial judge overruled the motion, stating that "[t]he defense counsel agreed to this method of selecting the jury. We have a full cross section of the citizens of this county."

While the defendant does not show actual prejudice, he argues that the integrity of the system was prejudiced as in Lynn, 924 S.W.2d 892.

Under Tennessee Code Annotated section 22-2-308(a)(2)(1980), the following procedures were to be followed in the event a special venire became necessary:

> In the event by reason of the disqualification of proposed jurors, or other cause, the required number of jurors cannot be obtained from the venire, the clerk of the court shall produce in open court the jury box, and the box shall be opened by the court and there shall be drawn therefrom, as directed by the court, the number of names deemed by the judge sufficient to complete the juries. This process shall, if necessary, continue until the grand and petit juries are completed; but the judge of the court instead of following the last mentioned procedure may, if the judge shall deem proper, furnish a sufficient number of names of persons to be summoned to the sheriff, or the judge may, if the judge thinks proper, direct the sheriff to summon a sufficient number to complete the juries.

Although the statutory procedures for calling a special venire were not properly followed in this case, we find that the circumstances do not require reversal as in Lynn, without a showing of actual prejudice to the defendant, which has not been made.

Again, in determining that failure to comply with the statutory requirements was reversible error, the supreme court described the violations found in Lynn:

> The clerk, not the judge, opened the box. The box was opened in the clerk's office, not in open court and not in the presence of the judge. The clerk, not the judge, drew the names and resealed the box. Neither party was advised that a new panel was being drawn. These circumstances, unlike those present in prior cases, are not an insignificant departure from technical statutory requirements. Rather, they represent a complete deviation from the directives established by our legislature.

Lynn, 924 S.W.2d at 895.

The court went on to distinguish the facts in Lynn from previous cases where the deviations from the statutory procedure were relatively minor and were either

23

inadvertent or were necessitated by circumstances beyond the control of the court. The court distinguished these violations because the "judicial proceeding had already been discolored by the trial judge's earlier findings of jury tampering. The fundamental principles of impartiality, disinterestedness, and fairness are even more essential in a case, such as this, in which a previous attempt to circumvent fairness has occurred." Lynn, 924 S.W.2d at 898. Based on these findings, the supreme court went on to hold:

> Because strict adherence to statutory jury selection procedures is essential to the integrity of the judicial process and the instilling of public confidence in the administration of justice, we hold that proof of actual prejudice is not required in circumstances such as this when the deviation is flagrant, unreasonable, and unnecessary.

Id. at 894.

Unlike the situation in Lynn, in the present case, time was of the essence in obtaining more jurors. The original venire was exhausted, and more jurors were needed by the next day. Moreover, while the defendant objected before the jury was sworn, he contributed to the situation by failing to object when the trial court announced that the clerk would be calling a special venire. The facts of this case are further distinguished in that there was no initial taint to the original venire from jury tampering as in Lynn. We read Lynn, in conjunction with Tennessee Code Annotated section 22-2-313, as applying narrowly to the facts of that case. Specifically, not only were the procedures for selecting a special venire violated, counsel was not notified of the calling of a special venire, and there were claims of jury tampering. Based on these cumulative errors, the supreme court was compelled to reverse the conviction in Lynn. The circumstances of this case do not require the same result without a showing of prejudice, which the defendant has failed to do. This issue has no merit.

### B. Systematic Exclusion of Women From Petit Juries in Maury County[4]

The defendant contends that the representation of women, a distinctive group in the community, on the jury summons lists in Maury County was not fair and reasonable

---

[4]Although the indictments were returned in Giles County, a motion for change of venue was granted, and the case was transferred to Maury County.

in relation to the number of women over the age of 18 in the community. The defendant contends, based on statistical data, there is an absolute disparity of 16%, a comparative disparity of 30%, and a discrepancy of 19.6 standard deviations. Moreover, the defendant submits that women have been consistently under represented on every Maury County summons list issued between February 1989 and the defendant's trial in December 1991. To the extent trial counsel failed to bring meritorious errors to the trial court's attention, the defendant contends he is entitled to relief based on ineffective assistance of counsel.

While the state asserts that this issue has been waived, we note that in Charles Walton Wright v. State, No. 01C01-9105-CR-00149 (Tenn. Crim. App., Nashville, April 7, 1994), perm. app. denied (Tenn. 1994), cert. denied, 513 U.S. 1163, 115 S. Ct. 1129 (1995), this Court held that the state's claim of waiver for the first time on appeal could "defeat substantial justice if there was potential merit ... to a claim of constitutional wrongdoing and the parties proceeded in the trial court without litigating or intending to litigate the issue of waiver." Charles Walton Wright, slip op. at 34. However, if the substantive claim had no merit, a remand is unnecessary. Id. At the hearing on the motion for new trial, the state did not present proof or argument on this issue. Moreover, although invited by the trial court to file a written response, the record does not reflect that a response was filed by the state. As such, the state is in the position of raising waiver for the first time on appeal. Accordingly, a review of the substantive claim is necessary; however, we find this issue is without merit.

In denying relief, the trial court stated:

[T]he Defendant asserts a violation of his right to an impartial jury selected from a fair cross-section of the community due to systematic exclusion of women from Maury County Petit juries. While Defendant has raised the issue of systematic exclusion in his Motion, his argument goes to underrepresentation. (See transcript of Motion for New Trial, pg. 157 et. seq) The Court finds that the proof in this case does not support a claim of systematic exclusion of women from petit juries of Maury County and that the Defendant, a white male lacks standing to assert an equal protection violation as to underrepresentation of women on the Maury County Petit juries.

The United States Supreme Court has held that a male has standing to

challenge the constitutionality of the exclusion of women from jury service. Taylor v. Louisiana, 419 U.S. 522, 526, 95 S. Ct. 692, 696 (1975). In Taylor, the court further held that the systematic exclusion of women is violative of the right to a petit jury selected from a representative cross-section of the community and guaranteed by the Sixth Amendment right to a jury trial. Taylor, 419 U.S. at 531, 95 S. Ct. at 698. Petit juries actually chosen, however, are not required to mirror the community or reflect the various distinctive groups in the population. Taylor, 419 U.S. at 538, 95 S. Ct. at 702.

In Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664 (1979), the Supreme Court set forth a three-pronged test for determining whether a jury was properly selected from a fair cross-section of the community:

(1)     that the group alleged to be excluded is a "distinctive" group in the community;

(2)     that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3)     that this under representation is due to systematic exclusion of the group in the jury-selection process.

Duren, 439 U.S. at 364, 99 S. Ct. at 668. This test was first applied by this court in State v. Nelson, 603 S.W.2d 158, 161 (Tenn. Crim. App. 1980), and later by our supreme court in State v. Buck, 670 S.W.2d 600, 610 (Tenn. 1984).

The defendant has met the first prong of this test, in that women are a "distinctive" group in the community. State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989), cert. denied, 497 U.S. 1031, 110 S. Ct. 3288 (1990). Moreover, if the unchallenged venire statistics are accurate, the defendant has demonstrated that the representation of women in the venire from which his jury was selected was neither fair nor reasonable under Adkins v. State, 911 S.W.2d 334, 353 (Tenn. Crim. App. 1994). According to the statistical proof presented by the defendant, women made up 53% of Maury County's population in 1990, yet the average percentage of women summoned on the venire lists from February 1989 to December 1991 was only 37%.

26

Regardless, the defendant has failed to show that this under-representation was due to systematic exclusion of women in the jury-selection process. In Taylor, the petitioner was able to point to a particular Louisiana constitutional and statutory requirement that systematically excluded women from the jury-selection process. Taylor, 419 U.S. at 524, 95 S. Ct. 694-95. The petitioner in Duren was able to demonstrate that a large discrepancy had occurred in every venire for a period of nearly a year. The facts supported a determination that under-representation of women was systematic or inherent in the particular jury-selection process utilized. Duren, 439 U.S. at 365-66, 99 S. Ct. at 669.

Here, the proof showed that the jury commissioners compiled lists of jurors from the voter registration books for their districts and from the telephone directory. When making the initial lists, they would automatically exclude those persons who they knew would be exempt from service, such as doctors, nurses, attorneys, and ministers. However, the commissioners testified that they tried to ensure that a fair cross-section of jurors was selected. The lists were given to the court clerk's office, and the names were typed on slips and placed in the jury box. Nothing in the record indicates this method of selecting jurors involves a systematic exclusion of women from jury venires in Maury County.

Moreover, four women sat on the jury that deliberated in this case. While a fifth woman was originally seated on the jury, she was replaced during trial by a male alternate juror. Our supreme court has held that the presence of three women on the petit jury constitutes a "fair representation of women on the jury and that is all that is required by the Constitution of the United States." State v. Strouth, 620 S.W.2d 467, 470 (Tenn. 1981). Accordingly, this issue is without merit. Moreover, by failing to show prejudice, the defendant's claim that counsel was ineffective for failing to raise this issue before trial is also without merit. See Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.

**C. Discrimination in the Selection of Grand Jury Forepersons in Giles County**

27

The defendant argues that although African-Americans represent 12% of the Giles County population over the age of 18, no African-American served in the position of foreperson of a Giles County grand jury between 1919 and 1990. The defendant contends that, based on statistical data, there is an absolute disparity of 12%, a comparative disparity of 100%, and a discrepancy of 2.3 standard deviations. Because selection of the grand jury foreperson is by judicial appointment, the defendant contends that the procedure is susceptible to abuse or is not racially neutral. To the extent that trial counsel failed to bring meritorious errors to the trial court's attention, the defendant contends that he is entitled to relief based on ineffective assistance of counsel.

While on appeal the state contends that this issue has been waived, at the hearing on the motion for new trial the state did not present proof or argument on this issue, nor did it accept the trial court's invitation to file a written response. As such, the state is in the position of raising waiver for the first time on appeal, and although this issue was not properly raised before trial, a review of the substantive claim is necessary to determine whether it has merit. Charles Walton Wright v. State, No. 01C01-9105-CR-00149, slip op. at 34.

In State v. Jefferson, 769 S.W.2d 875, 877 (Tenn. Crim. App. 1988), this court held that the issue of whether African-Americans were systematically excluded in the selection of the foreperson is subsumed by the issue of the systematic exclusion of African-Americans in the selection of the grand jury as a whole. In Jefferson, the state presented unrefuted expert testimony at trial concerning the role of the grand jury foreperson in Tennessee. Such proof showed that the grand jury foreperson's role is substantially ministerial and clerical in nature. Id. This court stated that "[i]n Tennessee, the foreman is the spokesperson for the grand jury and has the same voting powers as any other grand jury member. Not only does the foreman not have the power to veto an indictment, his authority, within this context, is no greater than any other member of the grand jury venire." Id. (citations omitted). The court stated that "[w]ith due respect to the dicta of the United States Supreme Court in Hobby [v. United States, 468 U.S. 339, 104

28

S. Ct. 3093, 82 L.Ed.2d 260 (1984)] suggesting otherwise, the proof adduced at trial supports the State's contention." Jefferson, 769 S.W.2d at 877; cf. Hobby, 468 U.S. 339, 104 S. Ct. 3093 (addressing issue of discrimination in selection of federal grand jury forepersons).

We decline to accept the defendant's argument that the prosecution must present expert testimony in each individual case to show that the role of grand jury foreperson is a ministerial position. Instead, we follow the holding in Jefferson. This issue has no merit. Consequently, by failing to show prejudice, the appellant's claim that counsel was ineffective for failing to raise this issue before trial is also without merit. See Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.

## II. PRE-TRIAL PUBLICITY

Next, the defendant contends that prospective jurors were exposed to extensive pre-trial publicity concerning this case and the Dugger murder. He argues: (1) venue was transferred without objection from Giles to Maury County even though Maury County had been subjected to greater media exposure; (2) the trial court and counsel failed to adequately question jurors concerning their exposure to pre-trial publicity; and (3) the jurors were improperly allowed to separate twice daily during the trial. We find these issues to be meritless.

In order to show that the media exposure in Maury County concerning this case and the Dugger case was substantial, the defendant, upon his motion for new trial, presented the testimony of Dwight Scott, a paralegal and investigator for the Capital Case Resource Center (CCRC) in Nashville. Scott reviewed newspaper articles, radio reports, and television reports in Davidson, Giles, Lawrence, and Maury Counties about this case and the Dugger case. Scott researched the circulation or anticipated audience size in the various counties. His affidavit and copies of newspaper articles and other printed media reports were introduced into evidence in support of the motion for new trial.

29

Trial counsel testified at the hearing on the motion for new trial that he knew about the publicity he had seen on television and in the local paper, "The Daily Herald," but he did not get copies of all the different newspaper articles to present to the trial court. Nor did trial counsel attempt to conduct a random survey to see if people had heard about the case or ask the court to distribute a questionnaire to prospective jurors in advance.

In an effort to show that jurors were infected by pre-trial publicity concerning the Dugger trial, the defendant presented the affidavits and testimony of three jurors. A fourth juror was not allowed to testify, but his affidavit is included in the record. The first juror testified that she heard testimony during this trial that Gwen Dugger was raped and murdered by the defendant or his brother when she was 13 years old. She also heard during the trial that Dugger was dead when the defendant had sex with her; however, the juror did not remember this being discussed during deliberations. In her affidavit, she stated that "[s]omeone who knew [the victim] brought out about the defendant having sex with the Dugger girl after death."

Another juror testified that although he did not remember making the statement to a CCRC investigator that he had heard testimony during this trial about the defendant having sex with Dugger's dead body and that he had considered it in voting, he was certain the signed statement was his. A final juror testified that during this trial, she heard testimony that Dugger was killed and buried in a dumpster or beside a dumpster in Pulaski. This juror also heard testimony that the defendant had sex with Dugger after she was dead, but she did not remember the jurors discussing it. She had heard or read about the Dugger case before trial.

Pursuant to Tennessee Rule of Criminal Procedure 21(a),

> In all criminal prosecutions the venue may be changed upon motion of the defendant, or upon the court's own motion with the consent of the defendant, if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.

In this case, trial counsel requested that venue be changed from Giles

County.  The trial court granted the motion, and moved the case to Maury County without objection.  In addition, the defendant failed to exercise all of his peremptory challenges to potential jurors, and the failure to challenge for cause or failure to use any available peremptory challenge to remove objectionable jurors precludes reliance upon allegations of disqualified jurors on appeal. State v. Irick, 762 S.W.2d 121, 125 (Tenn. 1988), cert. denied, 489 U.S. 1072, 109 S. Ct. 1357 (1989).  Accordingly, this issue was waived.  Tenn. R. App. P. 36(a).

The defendant contends that trial counsel was ineffective by failing to object to the change of venue to Maury County.  Therefore, we consider the merits of the issue in order to determine whether the defendant has shown prejudice as required under the second prong of Strickland.  In relation to this issue, the defendant submits that counsel was ineffective by failing to question potential jurors about their exposure to pre-trial publicity, despite individual voir dire.  As a result of neither the trial court nor counsel asking the jurors about the details of information they had heard about this case or the Dugger case, the defendant contends that the jurors who sat on this case had actual knowledge of "facts" from the Dugger case that were highly inflammatory and prejudicial and were not admitted into evidence.

In denying relief, the trial court made the following findings:

The Defendant next raises the issue of the jury being contaminated by exposure to extraneous prejudicial information.  Specifically Defendant objects that there was not a change of venue from Maury County to another County where the cause for a change of venue did not exist.  The Court recalls that this case was moved from Giles County to Maury County as a result of the Court ruling on a Motion for Change of Venue filed by Defendant requesting that the case be moved from Giles County and no further Motion for Change of Venue or objection to the location of the trial was made. Defendant also complains that the jurors were not asked about the nature, extent, or content of the extraneous information to which they were exposed and that the jurors were briefly separated from each other twice a day.  The Defendant however, has failed to prove that the jury was contaminated in any way by any extraneous information and the record of the trial will reflect that counsel examined prospective jurors closely in regard to what they had read, seen or heard in regard to this case and all their responses were heard by the Court.  The Court finds that the proof fails to show any contamination of the jury in this case and that this issue is without merit and is overruled.

31

On appeal, the findings of fact made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict. This Court will not set aside the judgment of the trial court unless the evidence in the record preponderates against its findings. State v. Dick, 872 S.W.2d 938, 943 (Tenn. Crim. App. 1993).

As noted by the defendant, the test for reversible error is whether the jurors who actually sat and rendered the verdict were unprejudiced by pre-trial publicity and were otherwise competent. See State v. Garland, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981). The defendant must demonstrate that the jurors who heard the case were biased or prejudiced because of pre-trial publicity. State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). Prejudice will not be presumed on the mere showing that there was considerable pre-trial publicity. Dobbert v. Florida, 432 U.S. 282, 303, 97 S. Ct. 2290, 2303 (1977); State v. Kyger, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989). The fact that there was extensive knowledge in the community of the crimes and of the defendant is not sufficient to render the trial constitutionally unfair. Dobbert, 432 U.S. at 303, 97 S. Ct. at 2303.

Moreover, it is sufficient "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723, 81 S. Ct. 1639 (1961). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." Id., 81 S. Ct. at 1642-43; see Adams v. State, 563 S.W.2d 804, 807 (Tenn. Crim. App. 1978).

In Irvin v. Dowd, two-thirds of the jurors actually seated had been exposed to a barrage of pretrial publicity right up until the time of trial, had already formed an opinion that the defendant was guilty, and acknowledged familiarity with material facts and circumstances of the case. Irvin, 366 U.S. at 726, 81 S. Ct. at 1645. In addition, even the headlines of one of the local newspapers reported during jury selection that "impartial

jurors are hard to find." Id., 366 U.S. at 727, 81 S. Ct. at 1645.    Although each of the jurors said that he could be impartial, the United States Supreme Court concluded that "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." Id. 366 U.S. at 728, 81 S. Ct. at 1645.

Unlike the jury in Irvin v. Dowd, the record in this case reflects that the exposure of the actual jurors to pre-trial publicity ranged from nonexistent to moderate. One juror stated that she did not remember hearing anything about the case.  Another stated that she had not heard of the case until the morning of jury selection, when she read in The Tennessean that eleven jurors had been seated in the case.  The other ten jurors all indicated that they had heard or read about the case; however, many of them could not remember anything about it.  All the jurors told the trial judge during voir dire that they had formed no opinion as to the defendant's guilt and that they could decide the case on the proof presented at trial.

While neither the trial court nor counsel asked jurors detailed questions about what they had heard or read about these cases, reversible error is not indicated. "[Q]uestions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial." However, such questions are not constitutionally compelled, and the trial court's failure to ask these questions is not reversible error unless it rendered the defendant's trial fundamentally unfair.  Mu'Min v. Virginia, 500 U.S. 415, 425-26, 111 S. Ct. 1899, 1905 (1991); see State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993).

As to the testimony and affidavits of jurors at the hearing on the motion for new trial, Tennessee Rule of Evidence 606(b) prohibits a juror from giving testimony on any matter or statement occurring during the course of the jury's deliberations or on the effect of anything upon a juror's mind or emotion as influencing his or her vote except that

33

a juror may testify on the question of whether any extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agree in advance to be bound by a quotient or gambling verdict without further discussion.

Regardless of whether the jurors' affidavits and testimony were admissible under Rule 606(b), the defendant's claim that the jurors who sat and rendered the verdict were prejudiced or biased by pre-trial publicity is unsupported. The jurors who testified at the hearing indicated that they heard from the witness stand certain facts concerning the Dugger murder which were apparently inaccurate and which were not testified to in this case. If this information was learned through exposure to pre-trial publicity, each juror swore to disregard any information they had previously heard outside the courtroom. Moreover, at the hearing on the motion for new trial, none of the jurors testified concerning what they had read or heard about this case or the Dugger case before sitting as jurors. Only one of the jurors who testified indicated in his affidavit that he considered these alleged facts from the Dugger case in voting to convict the defendant, and he could not remember signing an affidavit to this effect at the time of the hearing. The other two jurors did not remember any facts from the Dugger case being discussed during deliberations.

Like the trial court, we conclude that the defendant has failed to demonstrate that the jurors who heard the case were biased or prejudiced because of pre-trial publicity, rendering his trial fundamentally unfair. See State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). Consequently, we find that the defendant has failed to show how he was prejudiced by counsel's failure to seek a change of venue or to question potential jurors more extensively regarding their exposure to pre-trial publicity. See Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068.

Finally, it appears that the jurors separately drove the two and one-half miles between the court and their motel each day during the proceedings. The defendant did not present any proof that the jurors disobeyed the trial court's order concerning exposure to

news accounts of the trial or had contact with the general public during these separations. None of the jurors who testified indicated that the trial court's order was disregarded during the proceedings. While the possibility of an improper separation is increased when jurors are in the absence of a supervising officer, more than a possibility is necessary before the state is required to show that no prejudice occurred. See State v. McClain, 667 S.W.2d 64, 66 (Tenn. 1984) (jurors occupying separate motel rooms does not constitute an improper separation). This issue is without merit.

Accordingly, based on our review of the foregoing issues concerning the jury, we reject the defendant's contention that the cumulative effect of errors in selecting the jury requires the granting of a new trial.

### III. DEATH QUALIFICATION OF JURORS

In another issue, the defendant contends that the trial court erred and trial counsel was ineffective by failing to ensure that potential jurors were adequately questioned concerning their attitudes about the death penalty. Thus, the defendant submits that the jurors were unable to carry out their oaths as jurors at the sentencing stage by considering both punishments and by reserving the choice between life and death until after hearing and considering mitigation proof. The state does not address this issue in its brief.

A review of the voir dire proceedings, specifically of those jurors ultimately impaneled in this case, reflects that the only question asked of each was whether they could consider both punishments at the sentencing hearing. During voir dire, the prosecutor asked potential jurors a variation of the following question:

> In Tennessee, if the State carries the burden of guilty [sic], beyond a reasonable doubt, to where your mind rests easy, and the jury found the defendant guilty of first degree murder, there are two punishments. And there would be a sentencing hearing. The State would put on aggravating circumstances; the defense would put on mitigating circumstances, and then the jury would decide between life imprisonment and death by electrocution.

Could you consider both of those punishments?

Three of the impaneled jurors were asked the question without discussion of mitigating and aggravating circumstances:

In Tennessee, there are two punishments for first degree murder. One is life imprisonment and the other is death by electrocution. In the event we get to that stage of the trial, could you consider both of these punishments?

Each juror indicated that he or she could consider both punishments. Moreover, the jurors were duly sworn prior to trial and were properly instructed by the trial court at the sentencing hearing.

An accused has the right to a fair trial by an impartial and unbiased jury. State v. Houston, 593 S.W.2d 267, 272 (Tenn. 1980), overruled on other grounds, State v. Brown, 836 S.W.2d 530 (Tenn. 1992); see also State v. Melson, 638 S.W.2d 342, 362 (Tenn.1982). As noted in Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222 (1992), "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Id. at 729, 112 S. Ct. at 2230 (citing Dennis v. United States, 339 U.S. 162, 171-172, 70 S. Ct. 519, 523-524 (1950), and Morford v. United States, 339 U.S. 258, 259, 70 S. Ct. 586, 587 (1950)). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S. Ct. 1629, 1634 (1981) (plurality opinion).

In Morgan, the Supreme Court reversed the death sentence because voir dire was so inadequate as to lead the court "to doubt that petitioner was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment." Id. at 739, 112 S. Ct. at 2235. The court held:

[T]he belief that death should be imposed ipso facto upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. It may be that a juror could,

36

in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and 'infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.'

Id. at 735-736, 112 S. Ct. at 2233 (citations omitted). Accordingly, the Supreme Court determined that the "[p]etitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." Id. at 736, 112 S. Ct. at 2233.

In McQueen v. Scroggy, 99 F.3d 1302 (6th Cir. 1996), cert. denied, --- U.S. ---, 117 S. Ct. 2422 (1997), the court considered the issue of whether the petitioner was afforded the opportunity to question jurors adequately on their attitudes toward the death penalty and on whether they would impose it in every circumstance. As in the present case, the jurors in McQueen were questioned about whether they could accept and impose any penalty within the specified range after a determination of guilt had been made. Id. at 1329. In denying relief, the court stated:

A person who answers that he will consider every possible penalty, specifically including life imprisonment...is by virtue of that answering disclaiming the intent to impose the death penalty in every case. There are no magic words in these circumstances. Here the questions and answers disclose that the jurors were ready to consider each of the penalties that could be imposed, and that they were not predisposed to give only death or to act with leniency. It would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating.

Id. at 1330.

We are persuaded by the reasoning set forth in McQueen. While voir dire may certainly be used to educate jurors on the sentencing process in a capital trial, the true purpose is to ensure that a fair and impartial jury is impaneled. As discussed later in this opinion, the trial court properly instructed the jury on the law at the sentencing hearing, and the jury is presumed to have followed the instructions of the court. State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990).

Under Morgan v. Illinois, 504 U.S. at 736, 112 S. Ct. at 2233, a defendant must be given the opportunity to determine whether a potential juror would automatically impose a death sentence upon conviction. We do not interpret this holding to mean that each juror must be asked if he or she would reserve the choice between punishments until after hearing and considering mitigating proof. The fact that a juror indicates he or she will consider both punishments disclaims the intent to impose the death penalty in every case and is sufficient to ensure that a fair and impartial jury has been impaneled.

By our opinion we do not mean to imply that trial courts, prosecutors, and defense attorneys should not take the opportunity to explain these concepts and question potential jurors whether they could reserve judgment until such time as proof of aggravating and mitigating circumstances has been presented at the sentencing hearing. Instead, we are merely holding that the question asked of each of the jurors was sufficient in this case.

Accordingly, because we find this issue to be without merit, the defendant's claim of ineffective assistance must also fail. As noted earlier, when a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter, 523 S.W.2d at 936. Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. There must be a reasonable probability that but for counsel's error, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Best, 708 S.W.2d at 422. Should the defendant fail to establish either factor, he is not entitled to relief.

We cannot say that counsel's failure to ask potential jurors questions about their ability to reserve judgment on punishment until after hearing proof of mitigating circumstances was error. Defense counsel was not questioned about this matter at the hearing on the motion for new trial. Nevertheless, given his trial strategy of creating a

reasonable doubt at the guilt phase, we believe refraining from asking questions about sentencing could be employed as sound tactical approach, in that such questions could have been interpreted as an admission of guilt. Moreover, because we have found that the questioning of jurors was sufficient to ensure that a fair and impartial jury was impaneled, the defendant has suffered no prejudice.

In order to show that the jurors who sat in this case did not reserve judgment on the question of punishment, the defendant relies on the affidavits of three jurors. He argues that the trial court should not have impeded the development of the evidence by refusing to let one of the jurors testify concerning his "death qualification" and by only allowing the affidavits to be presented as offers of proof.

At the hearing on the motion for new trial, the defendant attempted to introduce into evidence the testimony and affidavits of jurors in order to prove that the jury was not impartial on the issue of punishment. Juror William Ivey's affidavit indicated that he believed "if two or more conditions existed, we had to give the death penalty." He also indicated in his affidavit that "some crimes should have an automatic death penalty - like murder, rape, and drug dealers." Juror Billy Taylor's affidavit stated "I had made up my mind when we found him guilty what the sentence should be - death." Juror Pamela Williams' affidavit confirmed that "one man had said he had made up his mind as soon as he got back to the jury room."

The trial court properly refused to consider the testimony or affidavits on the issue of whether the jurors who sat in this case were "automatic death penalty" jurors. As stated earlier, Tennessee Rule of Evidence 606(b) prohibits a juror from giving testimony on any matter or statement occurring during the course of the jury's deliberations or on the effect of anything upon a juror's mind or emotion as influencing his or her vote. The exceptions are that a juror may testify on the question of whether any extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agree in

39

advance to be bound by a quotient or gambling verdict without further discussion. Recently, in Henley v. State, --- S.W.2d ---, No. 01S01-9703-CC-00056, (Tenn. Dec. 15, 1997), our supreme court made it clear that Rule 606(b) prohibits consideration of jurors' testimony or affidavits as evidence of prejudice. --- S.W.2d at ---, slip op. at 18 (citing State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994)).

Next, the defendant contends that he was denied an impartial jury because neither the trial court nor defense counsel attempted to rehabilitate seven jurors who were excused because they expressed scruples against imposing the death penalty. In response, the state argues that the trial court properly excluded these seven jurors for cause because each had views toward capital punishment which would prevent or substantially impair the performance of their duties as jurors.

In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985). The Supreme Court further observed that "this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' " Id. Finally, the trial court's finding of bias of a juror because of his views concerning the death penalty are accorded a presumption of correctness, and the appellant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989).

Of the seven jurors excused for cause because of their views on the death penalty, three stated that they would not consider the death penalty under any circumstances. Another juror stated that he was not a proponent of the death penalty and would only consider voting for the death penalty if there was more than one independent witness to the murder and if the defendant was apprehended at the scene of the crime. Another juror stated that he could not impose the death penalty, noting that he thought it

40

was a worse punishment to impose a life sentence. Another juror stated that she would have a hard time giving regard to the death penalty and that her feelings on the subject were strong. Finally, the last juror excused for cause because of his views on the death penalty at first stated that he would give due consideration to both punishments, but then he indicated that he did not believe he could impose the death penalty. The juror then indicated that he would have to hear the case before he could determine if there was any case in which he would consider the death penalty. The juror finally answered that he did not believe in the death penalty, and he acknowledged that his beliefs would prevent him from voting for the death penalty. Neither the trial court nor defense counsel asked any questions concerning these jurors' abilities to consider the death penalty at the sentencing phase.

After reviewing the answers of these excluded jurors, we conclude that their answers left "no leeway for rehabilitation." Strouth, 620 S.W.2d at 471; Alley, 776 S.W.2d at 517-18. These jurors met the standard for dismissal. See State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994). While it would be more prudent for the trial court to adopt a policy of questioning jurors before excusing them for cause on this basis, the excluded jurors' answers to questions by the prosecutor adequately demonstrated that their views concerning the death penalty "would [have] 'prevent[ed] or substantially impair[ed] the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath[s].' " Wainwright, 469 U.S. at 424, 105 S. Ct. at 852; see also State v. Smith, 893 S.W.2d 908, 915-16 (Tenn.1994).

As noted earlier, great deference should be given to the trial judge, who is "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Wainwright, 469 U.S. at 426, 105 S. Ct. at 853. An appellant has the burden "to establish by convincing evidence that [those findings were] erroneous." Alley, 776 S.W.2d at 518. The defendant has failed to meet his burden in this case. See State v. Teel, 793 S.W.2d 236, 246-47 (Tenn. 1990).

41

Finally, the defendant contends that he was denied an impartial jury because none of the potential jurors were questioned during voir dire by the trial court or by defense counsel about their understanding of the following concepts:

a.  The meaning of terms, particularly the meaning of "mitigating circumstances."

b.  The burdens of proof of the parties.

c.  The standards of proof concerning mitigating and aggravating circumstances.

d.  The weighing process of aggravating circumstances versus mitigating circumstances, as qualitative, not quantitative.

e.  Aggravating circumstances as limited by statute, versus mitigating circumstances as not limited by statute.

f.  Statutory mitigating circumstances co-equal with nonstatutory mitigating circumstances.

g.  The different standards concerning the unanimity requirements in a determination of aggravating circumstances versus the determination of mitigating circumstances.

The defendant contends that the failure of the trial court and defense counsel to test the jurors' comprehension of these concepts was compounded by the trial court's failure to adequately instruct the jury at the sentencing phase. We disagree.

Again, the main purpose of voir dire is to ensure that a fair and impartial jury is impaneled. As discussed later in this opinion, many of the areas which the defendant claims should have been addressed during voir dire are subjects that our supreme court has rejected in the context of jury instructions. Furthermore, we have found that the trial court's instructions to the jury at the sentencing phase were correct, and it is presumed that the jury followed those instructions. Woods, 806 S.W.2d at 211. As noted in Gacy v. Welborn, 994 F.2d 305 (7th Cir. 1993), a defendant's "safety lies in the size of the jury and in cautions from the court, not in extra questions posed in advance of trial. A long series of probing questions can anesthetize or offend the panel rather than enlighten judge and counsel." Id. at 315. This issue is without merit.

Accordingly, based on our review of the foregoing issues concerning the jury, we reject the defendant's contention that the cumulative effect of errors in selecting the jury

requires the granting of a new trial or sentencing hearing.

## IV. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to support a finding that he killed the victim in a premeditated and deliberate fashion rather than in a heated rage.  We find that the evidence was sufficient to support the jury's verdict.

A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state's theory.  State v. Williams, 657 S.W.2d 405 (Tenn. 1983). On appeal, the state is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which might be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978).  Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal.  State v. Grace, 493 S.W.2d 474 (Tenn. 1973).  The appellant has the burden of overcoming this presumption of guilt.  Id.

In reviewing the sufficiency of the evidence, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781 (1979); State v. Duncan, 698 S.W.2d 63 (Tenn. 1985).

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.  State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987).  Here, the evidence was circumstantial.  Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypotheses save the guilt of the defendant, and that beyond a reasonable doubt."  Crawford, 225 Tenn. at  482, 470 S.W.2d at 612.  "A web of guilt must be woven around the defendant from which he cannot

43

escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. 225 Tenn. at 484, 470 S.W.2d at 613.

Former Tennessee Code Annotated section 39-2-202 required that a killing be intentional, premeditated, and deliberate to constitute first-degree murder. In State v. Brown, 836 S.W.2d 530 (Tenn. 1992), our supreme court held that the element of deliberation contemplates a lapse of time between the decision to kill and the actual killing. The court stated that "the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait -- the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain." Brown, 836 S.W.2d at 539 (quoting Rader v. State, 73 Tenn. 610, 619-20 (1880)).

Thus, in order to convict a defendant for first-degree murder, a jury must find that the defendant killed with coolness or deliberation and after reflective thought or premeditation. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); see also State v. Brooks, 880 S.W.2d 390, 392-93 (Tenn. Crim. App. 1993).[5]

There is no specific time required to form the requisite deliberation. State v. Gentry, 881 S.W.2d 1, 3-4 (Tenn. Crim. App. 1993). Deliberation is present when the circumstances suggest that the defendant contemplated the manner and the consequences of his act. West, 844 S.W.2d at 147. While deliberation and premeditation are similar, they are defined as separate and distinct elements of first-degree murder. See Tenn. Code Ann. § 39-2-201(b)(1982)(deliberate act is "one performed with a cool purpose" and premeditated act is "one done after the exercise of reflection and judgment."); see also Brooks, 880 S.W.2d at 392-93.

Deliberation and premeditation may be inferred from the circumstances

---

[5]In all fairness to the trial court, we acknowledge that the decisions in Brown, West, and Brooks were rendered after the trial in the instant case.

where those circumstances affirmatively establish that the defendant premeditated his assault and then deliberately performed the act. State v. Richard Nelson, No. 02C01-9211-CR-00251 (Tenn. Crim. App., Jackson, Oct. 14, 1993). This Court has held that Brown requires "proof that the offense was committed upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement" before a second-degree, intentional murder can be elevated to murder in the first degree. State v. David L. Hassell, No. 02C01-9202-CR-00038, slip op. at 3 (Tenn. Crim. App., Jackson, Dec. 30, 1992).

With regard to premeditation and deliberation, the Court in State v. Brown recognized the following relevant circumstances: (1) a deadly weapon was used upon an unarmed victim, (2) a weapon with which to commit the homicide was procured, (3) the homicidal act was part of a conspiracy to kill persons of a particular class, (4) the killing was particularly cruel, (5) the defendant made declarations of his intent to kill the victim, or (6) preparations were made before the homicide for concealment of the crime, as by the digging of a grave. Brown, 836 S.W.2d at 541-42 (citation omitted). The elements of deliberation and premeditation are questions for the jury and may be inferred from the manner and circumstances of the killing. Gentry, 881 S.W.2d at 3.

The facts of this case, albeit circumstantial, support the jury's finding of premeditation and deliberation. Denise, who the jury could have considered an accomplice, was the only witness as to the details of the murder. Accordingly, although not raised as an issue in this appeal, we note that the trial court properly charged the jury on accomplice testimony because a defendant cannot be convicted on the uncorroborated testimony of an accomplice. See State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994), perm. app. denied (Tenn. 1995); Prince v. State, 529 S.W.2d 729, 732 (Tenn. Crim. App. 1975). "The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime." Sherrill v. State, 204 Tenn. 427, 435, 321 S.W.2d 811, 815 (1959). To be corroborative, the evidence need not be adequate in and of itself to convict. McKinney v. State, 552 S.W.2d 787, 789 (Tenn. Crim. App. 1977). Only slight circumstances are required to

furnish the necessary corroboration.  Garton v. State, 206 Tenn. 79, 87, 332 S.W.2d 169, 175 (1960).  The sufficiency of the corroboration is a jury determination, and this court may not substitute its judgment for that of the fact finder.  State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).  In the present case, we find that Denise's testimony was corroborated sufficiently.

As to premeditation, the proof showed that the defendant's wallet was stolen about a month before the victim disappeared.  The defendant acknowledged that at the time, he thought the victim had taken his wallet and confronted him the night it disappeared.  Although the defendant claimed that everything went back to normal after this confrontation, Strickland, a co-worker, testified that after the wallet incident, he started giving the victim a ride to work, and the defendant said that he and Pete were going to pull the victim from Strickland's car.  When the wallet disappeared, the defendant told Denise that he believed the victim stole it and that no one steals from him or "little Matthew."

The day after the murder, the defendant told Denise that he started thinking about the wallet, Matthew's disability check, and the victim cheating at cards before he beat the unarmed victim with a child's rocking chair until there was nothing left but a small piece of the chair. The defendant continued beating the victim and telling him no one steals from "little Matthew" thirty minutes after the victim was dead.  After the murder, the defendant made similar comments to co-workers about how no one would steal from him or Matthew and get away with it.

In Brown, 836 S.W.2d at 542, our supreme court held that repeated blows, by themselves, were insufficient to support a conclusion that a killing was premeditated. However, other circumstances, such as a declared intent to kill or the use of a deadly weapon, are relevant to premeditation.  Id. at 541; State v. Burlison, 868 S.W.2d 713, 718 (Tenn. Crim. App. 1993).  In this case, the defendant's statements of intent support the jury's finding of premeditation.

46

The defendant's actions immediately after the killing support the jury's finding of deliberation. In State v. West, 844 S.W.2d at 148, the supreme court noted that "[c]almness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder" (citations omitted). According to Denise's testimony, the defendant put the victim's body in the bathtub after he finished beating him. Then, the defendant called his brother to have him come over and help cut up the body so that it could be hauled to Westpoint, where it was burned. See e.g., State v. Glenn Bernard Mann, No. 02C01-9502-CC-00046, slip op. at 10 (Tenn. Crim. App., Jackson, Aug. 16, 1996); Tenn. R. Sup. Ct. 12(2) appeal pending (Tenn. 1996); State v. William Singleton, Jr., No. 03C01-9406-CR-00221, slip op. at 6-8 (Tenn. Crim. App., at Knoxville, March 13, 1995), perm. app. denied (Tenn. 1995).

Accordingly, we find that the evidence in the record was sufficient for a rational juror to conclude that the defendant was guilty of premeditated and deliberate murder.

In a related issue, the defendant contends that the jury instructions regarding the elements of first-degree murder violated the dictates of Brown, and that such error was not harmless due to the insufficient evidence of premeditation and deliberation. We find this issue to be of no merit.

The trial court gave the following jury instruction on premeditation and deliberation to the jury:

> A premeditated act is one done after the exercise of reflection in judgment. Premeditation means that the intent to kill must have been formed prior to the act, itself. Such intent or design to kill may be conceived and deliberately formed in an innocent [sic]. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval, as long as it was the result of reflection and judgment.
>
> The mental state of the accused, at the time he allegedly decided to kill, must be carefully considered in order to determine whether the accused was sufficiently free from passion. If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may have been in a state of passion or excitement, when the design was carried into effect.
>
> Furthermore, premeditation can be found, if the decision to kill is first formed during the heat of passion, but the accused commits the act after the

passion has subsided.

(Emphasis added).

Initially, and preemptively, we note that, since Brown was decided after the trial in the present case, it does not apply to the instructions given to the jury. See Lofton v. State, 898 S.W.2d 246, 249-50 (Tenn. Crim. App. 1994); James Rines v. State, No. 03C01-9606-CC-00210, slip op. at 7 (Tenn. Crim. App., Knoxville, Jan. 28, 1997), perm. spp. denied (Tenn. 1997). However, we note, parenthetically, that had Brown applied, the jury instruction in the present case would have been in compliance. In Brooks, 880 S.W.2d 390, this court held that the jury instruction failed to distinguish and separate premeditation and deliberation as required by Brown. Brooks, 880 S.W.2d at 393. As argued by the state, although the jury instruction given in this case was similar to the one given in Brown, the trial court included saving language to ensure that the jury separated the elements of premeditation and deliberation. Specifically, the trial court instructed the jury that "[i]t is sufficient that it preceded the act, however short the interval, as long as it was the result of reflection and judgment." We find no reversible error in the jury instruction.

The defendant also argues that the evidence was insufficient to support his conviction of arson. He points out that according to Denise's testimony, Pete acknowledged he was the one who burned the victim's house, and the defendant was working at the time of the fire. Accordingly, the defendant submits that the trial court should have granted a judgment of acquittal or, alternatively, it should have granted a new trial because the verdict was contrary to the weight of the evidence. We disagree.

Tennessee Code Annotated section 39-3-202 (1982) defines arson as:

> Any person who willfully and maliciously sets fire to or burns, causes to be burned, or who aids, counsels or procures the burning of any house or outhouse, or any building, or any other structure, the property of himself or of another, shall be guilty of arson.

In reviewing the evidence in the light most favorable to the state, we find that a rational trier of fact could have found the essential elements of arson beyond a

48

reasonable doubt. Jackson, 443 U.S. 307, 99 S. Ct. 2781; Duncan, 698 S.W.2d 63; Tenn. R. App. P. 13(e). Specifically, the circumstantial evidence was sufficient for the jury to find the defendant caused his brother Pete to set the fire. On the evening after the fire, Denise went to meet the defendant at the Pulaski Rubber Company. He asked if she knew about the fire and suggested she drive by the victim's house. Later that night, Denise returned to the Pulaski Rubber Company to meet the defendant. Pete was there, and in the presence of the defendant, he told Denise how the fire was started in the front bedroom with a candle. When the three of them drove by the house, the defendant stated that the victim had "gotten what was coming to him for stealing from Matthew."

The defendant's normal shift was from 3 p.m. to 11 p.m., and the fire was called in at 11:47 p.m. From the defendant's account, he had already left work by this time, gone to the Western Lounge, and walked out into the parking lot to drive home when he saw the flames from the victim's house. Instead of going to the house, the defendant went home because he had been drinking beer and did not want to risk being arrested for drunk driving.

The verdict is further supported by the defendant's previous actions in covering up the murder: cutting up the body, pouring Drano in the bathtub to remove any hair or blood, cutting out the carpet where the murder occurred, burning the body, and having Denise call and report the victim off from work. Accordingly, as to the arson conviction, we find that the evidence supports the jury's verdict and that the verdict is not contrary to the weight of the evidence.

In a related issue, the defendant contends that his arson conviction should be reversed because the indictment charged more than one offense of arson and the trial court failed to require the prosecution to elect the particular offense of arson upon which it would rely for conviction. We find that this issue is without merit.

The indictment in this case closely tracked the language of Tennessee Code Annotated section 39-3-202(1982):

> That Pat Bondurant on or about the 22nd day of October, 1986, in Giles County, Tennessee and before the finding of this indictment, did unlawfully, willfully, and feloniously set fire to, or burn, cause to be burned, or aided, counseled or procured the burning of a house or outhouse, or any building, or any other structure, to-wit: the residence of William Ronnie Gaines, the property of Mrs. Raymond Fry.

Also in accordance with the statute, the trial court instructed the jury that they could only convict the defendant of arson if they found that he "set fire to, burned, caused to be burned, or aided, counseled, or procured the burning of the alleged property."

The doctrine of election requires the state to elect which set of facts it wishes to rely upon when it has charged a defendant with one offense but there is evidence of multiple, similar offenses. State v. John D. Bain, Sr., No. 03C01-9311-CR-00384 (Tenn. Crim. App., Knoxville, August 21, 1995). This doctrine has been applied to crimes of a sexual nature where there have been several separate incidents of sexual assault. In Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), the supreme court held that in such cases it is the duty of the trial court to require the state to make an election at the close of its case-in-chief as to the specific offenses it wishes to rely on for conviction. Id. at 804. In Burlison, the court set forth three fundamental reasons for requiring the state to make an election:

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue, and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

Id. at 803. In State v. Shelton, 851 S.W.2d 134 (Tenn. 1993), the supreme court emphasized the third reason as the most important, pointing out that a unanimity instruction, as given in this case, is necessary "to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." Id. at 137 (citations omitted).

50

In our view, the case before us does not warrant application of the rule that requires the state to "elect the particular offenses for which convictions are sought." Shelton, 851 S.W.2d at 137. The case does not fit within the rubric to which the rule of Burlison-Shelton normally applies. The indictment alleges a single offense, and the proof reflects only a single act of arson. There was no other "particular offense" alleged or proved. It is true the arson statute quoted above proscribes conduct through the use of alternative verbs, or theories of offending, but in Tennessee the need for election is not implicated by the statutory use of proscriptive terms in the disjunctive. See Tenn. Code Ann. § 40-18-112 (1990) (Where statute provides "different means" by which an offense may be committed, the jury may convict even if it is "uncertain . . . by which of the means charged the offense was committed.") and Tenn. Code Ann. § 40-13-206 (1997) ("When the offense may be committed by different forms, by different means or with different intents, such forms, means or intents may be alleged in the same count in the alternative."). See also Schad v. Arizona, 501 U.S. 624, 649, 111 S. Ct. 2491, 2506 (1991) ("As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission.") (Scalia, J., concurring). In the case at bar, the proof showed that the offense was committed, if at all, under only one theory and by only one act, despite the other possible theories afforded by the statute. All of the proof demonstrates that if the defendant contravened the statute, he did so through the more vicarious actions of aiding, counseling, or procuring the arson, rather than through the more direct actions of setting fire, burning, or causing the house to burn. In this case, election of neither theories nor acts is required.

## V.  SEARCH WARRANT

The defendant argues that the trial court erred by finding he lacked standing to contest the search warrant executed at his parents' residence in Westpoint. Initially, he asserts that the prosecution is estopped from arguing that he lacked standing to challenge the search warrant because the warrant and the attached affidavit included assertions that the defendant occupied the Westpoint residence. Specifically, the affiant requested a

51

warrant to search "the person and premises of the said Pete and Pat Bondurant above described," and the defendant contends that the state is bound by its admission of his standing to contest the search warrant. In support of this proposition, the defendant cites Steagald v. United States, 451 U.S. 204, 101 S. Ct. 1642 (1981), State v. Moore, 775 S.W.2d 372 (Tenn. Crim. App. 1989), and State v. White, 635 S.W.2d 396 (Tenn. Crim. App. 1982).

Contrary to the defendant's assertion, these cases stand for the proposition that if the state fails to raise the issue of standing in the trial court, but instead opposes the motion to suppress on the merits, the defendant is entitled to infer that the state concedes his standing and need not present any proof of his expectation of privacy. White, 635 S.W.2d at 399-400; see also Steagald, 451 U.S. at 209, 101 S. Ct. at 1646. Accordingly, the state would be estopped from raising the issue of standing for the first time on appeal. Moore, 775 S.W.2d at 374. Here, the issue of standing was raised by the state at the suppression hearing and fully litigated.

Next, the defendant asserts that the state should not have been allowed to present oral testimony contradicting the affidavit on the issue of standing. The defendant is correct that the state is prohibited from attempting to impeach the veracity of the search warrant affidavit. See O'Brien v. State, 205 Tenn. 405, 418, 326 S.W.2d 759, 764 (1959); Harvey v. State, 166 Tenn. 227, 228-29, 60 S.W.2d 420, 420 (1933); Poole v. State, 4 Tenn. Crim. App. 41, 50-51, 467 S.W.2d 826, 830-31 (1971). In the present case, however, testimony was introduced by the state on the issue of whether the defendant had a reasonable privacy interest in his parents' property that is protected by the Fourth Amendment, rather than to impeach the veracity of the affidavit. As such, the defendant's authorities are not controlling of the case at bar.

Next, the defendant argues that the evidence presented at the suppression hearing was sufficient to establish that he resided at the Westpoint house regularly, albeit not continuously, and that this was sufficient to establish standing.

52

At the initial hearing on the motion to suppress, Agent Coleman testified that he procured the search warrant on May 7, 1990 to search the Bondurants' residence in Westpoint in Lawrence County. Before that time, Coleman had talked to Denise on a daily basis since February of 1990. During this time, Denise told Coleman information that had proven to be true. Coleman took Denise's written statements on May 1, 1990, and based on this information, he requested a search warrant on May 7.

At a second hearing on the motion to suppress, the defendant's mother testified that from January 1990 until the time he was arrested, the defendant spent at least three or four nights a week at the house in Westpoint. While the defendant sometimes stayed at Denise's apartment or at Pete's apartment in Pulaski, he did not have a home anywhere else, nor did he own or rent any other premises. He kept clothes, washed clothes, and ate his meals at the house in Westpoint. The defendant called the room upstairs his and kept some of his belongings there. From the time Mrs. Bondurant and her husband moved back to the United States in 1989, the defendant brought their grandson to stay with them almost every weekend.

Mrs. Bondurant and her husband bought the house in 1984. Because her job required her to travel, the twins stayed home with their father. In July 1985, Mr. and Mrs. Bondurant went back to Germany and rented the house to Pete until August 1987. After that, they rented the house to someone else until they returned on September 8, 1989. At that time, Pete and the defendant lived at the house with them.

After the defendant was arrested, he received his mail at Westpoint, some of which was forwarded to that address. Mrs. Bondurant testified that a lot of work had been done to the property, including the building of a driveway near the area where the skull fragments were found.

The state presented proof that the defendant's voter registration on April 4, 1973, listed the defendant as living in Elkton. Although the defendant changed his

registration in 1982, 1984, and 1987, he never used the Westpoint address. Moreover, none of his vehicles had ever been registered at the Westpoint address. Denise testified that at the time she started cooperating with police, the defendant was living in Pulaski with his brother Pete and also spent a couple of nights a week at her apartment. She had not known the defendant to make or claim residence at Westpoint during that time up until he was arrested in April of 1990. Moreover, according to the defendant's own testimony at his bond hearing, the transcript of which was introduced as an exhibit to the suppression hearing, he had lived in Giles County since 1973, except for several months when he lived in Lawrenceburg.

In denying the motion on the basis of standing, the trial court stated:

> The Court is going to overrule the motion for this reason: I think the testimony is unclear, at least to the Court, as to where Mr. Bondurant was living at that point in time. His mother said he was living with her part of the time, and his wife says he was living with her part of the time, and part of the time with his brother, Pete, so I don't know.

> [The court discusses the case of Bumper v. North Carolina, 390 U.S. 1021, 88 S. Ct. 1407 (1968)]

> But I'm going to find that he has no standing to object to the search, which was done to the backyard area of Mr. and Mrs. Bondurant's farm at West Point, where the bone fragments were found.

> And I'm going to further find that the only interest Mr. Bondurant possesses in this farm is the hope of an inheritance interest at some time in the future.

On appeal, a trial court's findings of fact on a motion to suppress are conclusive unless the evidence preponderates against those findings. State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990); State v. Johnson, 717 S.W.2d 298, 304-05 (Tenn. Crim. App. 1986).

When challenging the reasonableness of a search or seizure, the defendant has the burden of first establishing a legitimate expectation of privacy in the place or property which is searched. Rawlings v. Kentucky, 448 U.S. 98, 104-05, 100 S. Ct. 2556, 2561 (1980); State v. Roberge, 642 S.W.2d 716, 718 (Tenn. 1982). Although relevant to the standing inquiry, an ownership interest in the property searched is not a prerequisite

to establishing a legitimate expectation of privacy. In fact, an individual may possess a legitimate expectation of privacy in another person's residence. State v. Turnbill, 640 S.W.2d 40, 45 (Tenn. Crim. App. 1982). This Court has held that the following seven factors are applicable to the standing inquiry:

> (1)     property ownership;
>
> (2)     whether the defendant has a possessory interest in the thing seized;
>
> (3)     whether the defendant has a possessory interest in the place searched;
>
> (4)     whether he has a right to exclude others from that place;
>
> (5)     whether he has exhibited a subjective expectation that the place would remain free from governmental invasion;
>
> (6)     whether he took normal precautions to maintain his privacy; and
>
> (7)     whether he was legitimately on the premises.

State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991) (quoting United States v. Haydel, 649 F.2d 1152, 1154-55 (5th Cir.1981)); Woods, 806 S.W.2d at 208. In making this determination, technicalities of property law or the intricacies of the law of inheritance are not relevant. Instead, the issue is whether the defendant had a reasonable expectation of privacy in the property searched at the time the search occurred. Rawlings, 448 U.S. at 104-05, 100 S. Ct. at 2561; see Roberge, 642 S.W.2d at 718.

In reviewing the applicable factors, we find that the evidence does not preponderate against the trial court's findings. At the suppression hearing, the defendant did not claim any possessory interest in the property (skull fragments) seized, and there was no proof that he had a possessory interest in the place searched or a right to exclude others from the property. The appellant did not exhibit a subjective expectation that the place would remain free from governmental invasion. In fact, he indicated to Denise, after finding a human bone while cleaning up his parents' yard, that he believed the police had already searched the property and had failed to notice the bone. Nor did the defendant take precautions to maintain the privacy of the area where the skull fragments were found.

55

Accordingly, the defendant has failed to show that he had a legitimate expectation of privacy in his parents' property.

In State v. Roberge, 642 S.W.2d 716, our supreme court held:

> It is fundamental that one challenging the reasonableness of a search or seizure has the burden of establishing a legitimate expectation of privacy in the place or property which is searched. One does not have automatic standing to challenge a search simply because he is convicted of a possessory offense. Further, one accused of a criminal offense may testify at a suppression hearing without incurring the risk that his testimony will be used against him by the prosecution as part of its case in chief. Therefore, in our opinion, it was incumbent upon [the defendant] to establish in some way that he had some claim to or interest in the [item seized]....

Id. at 718 (citations omitted).

The proof at the suppression hearing indicated that the defendant was, at best, an occasional guest at his parents' house in Westpoint. Neither the defendant's voter registration nor his vehicle registrations listed the Westpoint address. Moreover, the defendant testified at his bond hearing that he had lived in Giles County since 1973, except for several months when he lived in Lawrenceburg. While the defendant may have stayed at his parents' house from time to time, there was no proof at the hearing that he had any right to exclude others from the property or that he had a key. We hold that the defendant lacks the capacity to claim Fourth Amendment protection as to the evidence seized.

## IV.  MARITAL PRIVILEGE

In another issue, the defendant contends that the marital privilege, as it existed in common law at the time of trial, should have prevented Denise from testifying to events related to her by the defendant about the killing and disposal of the victim. The defendant submits that the case law relied upon by the trial court, Adams v. State, 563 S.W.2d 804 (Tenn. Crim. App. 1978), was an aberrant decision that departed from the supreme court's decision in McCormick v. State, 135 Tenn. 218, 186 S.W. 95 (1916). The defendant acknowledges that our supreme court changed the common law in State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S. Ct. 328 (1994);

however, this case law was not in effect at the time of the murder or of the trial. Subsequently, the legislature codified the law in <u>McCormick</u>, and the defendant further argues that the new statute should be applied retroactively.

A hearing was held on the defendant's motion in limine to exclude Denise's testimony at trial. At the hearing, Denise testified that she was married to the defendant at the time he made inculpatory statements to her. She had been separated from the defendant since August 1986, after a fight in which the defendant beat Denise, who was pregnant at the time, and held a gun to her head. Subsequently, she then moved in with her sister for two months but moved back to Pulaski in October 1986 and rented an apartment. At that time, Denise was having sexual relations with the defendant; however, she claimed that she "prostituted" herself to the defendant because she was financially dependent upon him. Denise did not file for divorce until June 1990, after the defendant was arrested. She testified that she did not file for divorce sooner because she was afraid based on earlier statements made by the defendant.

In order to further explain her relationship with the defendant, Denise related the facts surrounding the Dugger murder. In May 1986, a party was held at the farmhouse in Elkton, where Denise and the defendant lived together prior to their separation. Denise testified how Dugger, who was heavily drugged, fell and hit her head. The defendant, Pete, and another man all wanted to have sexual relations with Dugger. Dugger was moved to various rooms, and Denise walked in while the defendant was having sex with her. Denise hit Dugger and slapped the defendant. The defendant began to tell Denise that she could have the car and other assets, as though he realized the marriage was over. The men then took Dugger outside to the barn but later brought her back into the house. Denise started slapping Dugger to wake her up. She also accused Dugger of sleeping with her husband. Dugger got up and started swinging at Denise with her arms. The defendant came into the room with a big stick and told Denise to use it on Dugger. Denise refused, realizing that Dugger was still heavily drugged. The defendant said "Well, I'll do it for you," and he started beating Dugger on the head. As Dugger tried to get up, the defendant beat

57

her on the side to knock her down.  Once Dugger was unconscious, the defendant engaged in sexual intercourse with her, until Dugger lost control of all bodily functions. While the defendant went to clean up, Pete shot Dugger in the head twice.  Later, the defendant and Pete burned Dugger's body.

Because the defendant and Pete told Denise that if she ever reported Dugger's demise to the police, they would both implicate Denise and cause her child to be born in prison, she remained silent.  She was also silenced by the defendant's statement that "united we stand, divided we fall," which Denise testified meant as long as the three of them stood together nobody would go to jail, but if one of them was to fall, all of them would go to jail.

In overruling the motion to keep Denise's testimony out, the trial court stated:

I'm going to overrule the motion.  I just don't think it fits Adams.

For one reason, I cannot imagine – first of all, I'm going to make a finding that this lady's silence was a silence because of fear from what she had witnessed and what she had been told.  And secondly, I'm going to find that the relation – in no way, in my opinion or in the opinion of the community, should this relation be one that should be sedulously fostered.

I mean, the facts we've heard, today, they're uncontroverted. The jury may not fine [sic] Mr. Bondurant guilty, but I just cannot believe that the marital privilege was created for a situation, such as we have heard in this case.  For those reasons, I'm going to overrule your motion.

The applicable rule of marital privilege in this case was announced by our supreme court in McCormick, 135 Tenn. 218, 186 S.W. 95.  As this court has held, the law regarding marital privilege is procedural rather than substantive in nature for purposes of ex post facto review.  State v. Bragan, 920 S.W.2d 227, 241 (Tenn. Crim. App. 1995).  As such, the marital privilege law at the time of the trial prevails.

We note that in Hurley, 876 S.W.2d 57, our supreme court modified the marital privilege in criminal cases so that the testifying spouse alone had the right to invoke the privilege.  Id. at 64.  The Hurley modification of the common law rule was then superseded by statute when the Legislature, in 1995, amended Tennessee Code

58

Annotated section 24-1-201 to provide in part that confidential communications between married persons are privileged and inadmissible if either spouse objects. Although argued by the defendant, he is not entitled to retroactive application of the amended statute because such was a procedural change. Bragan, 920 S.W.2d at 241.

In McCormick, our supreme court held that "[s]ound public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation." 135 Tenn. at 228, 186 S.W. at 97; see also Burton v. State, 501 S.W.2d 814, 817-819 (Tenn. Crim. App. 1973). Under this rule, either the testifying or non-testifying spouse can invoke the privilege; however, this privilege is not absolute. In Adams, 563 S.W.2d 804, this Court recognized that the following conditions must all exist before a communication between spouses is considered privileged:

(1)     The communications must originate in a confidence that they will not be disclosed.

(2)     This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3)     The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4)     The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

Id. at 808. Where the marriage between the parties is "extremely tumultuous," this Court has observed that application of the marital privilege is inappropriate. State v. Garland, 617 S.W.2d 176, 182-83 (Tenn. Crim. App. 1981); see also State v. Bush, 942 S.W.2d 489, 509-10 (Tenn. 1997) (appendix, Court of Criminal Appeals opinion), petition for cert. filed (U.S. July 28, 1997).

In the present case, the proof supports the trial court's finding that this is not the type of relationship that the court should sedulously foster. The relationship between the defendant and Denise was "extremely tumultuous." Not only was Denise physically assaulted by the defendant, she witnessed the defendant beat Gwen Dugger over the

59

head with an ax handle and then rape her vaginally and anally while she was unconscious. Pete then shot Dugger in the head, and the two brothers took the body to a field and burned it. Denise was kept silent by the defendant's threats that if she talked to the authorities, he and Pete would blame the murder on her, and she would have her unborn child in prison. This is not a relationship that should be sedulously fostered, nor is the injury to the relationship by the disclosure of these communications greater than the benefit gained by the correct disposal of the brutal murder in the case now before us. The state's interest in the disclosure of the defendant's statements concerning the victim's murder far outweighed any injury to this marital relationship.

The findings of fact made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict, and this court will not set aside the judgment of the trial court unless the evidence in the record preponderates against its findings. Dick, 872 S.W.2d at 943. The proof overwhelmingly supports the trial court's finding that Denise was properly allowed to testify at trial.

## VII. PRIOR CRIMINAL ACTS

Initially, the defendant contends that the trial court should have declared a mistrial based on Denise's testimony concerning the Dugger murder during direct and cross-examinations. He argues that the introduction of testimony concerning the Dugger case was unduly prejudicial evidence of propensity, especially in light of the fact that Dugger's body was burned in a similar manner as that of the victim in this case. We find that any error was harmless.

During direct examination, Denise Bondurant testified that she lied to the authorities when initially questioned about the victim's disappearance:

A.   Whatever I did tell them, I probably lied.

Q.   And why was that?

A.   To try to protect my husband.

60

Q. And why were you trying to protect your husband, at that time Mrs. Bondurant?

A. Because I was afraid not to, because of the murder of Gwen Dugger.

Q. Well, --

MR. JERRY COLLEY: Objection, if the Court please. Now, that's wrong, and he knows it and she knows it.

THE COURT: Okay. Okay. I'll sustain that.

Thereafter, defense counsel cross-examined Denise extensively as to why she maintained contact with the defendant and why she did not reveal his actions to the authorities sooner. Counsel questioned Denise as to whether she was actually afraid of the defendant. As a result, the state requested a jury-out hearing concerning the issue of whether the defendant had opened the door for Denise to testify that she was afraid of the defendant because she had been present when Gwen Dugger was murdered. It appears that at some point before her testimony, the trial court had instructed Denise not to reveal the details of the Dugger murder during her testimony.

After considering argument on the matter, the trial court held that by pursuing a line of cross-examination intended to question whether Denise was actually afraid of the defendant, defense counsel opened the door to this testimony and the state should be allowed to question Denise on redirect as to why she was afraid of the defendant.

As cross-examination continued, defense counsel questioned Denise about the number of times she talked with authorities. Denise also gave the following answers that touched on the Dugger murder:

Q. Would it make any difference, Mrs. Bondurant, where they [sic] body was, if there was news about the disappearance of Gaines?

A. Well, that would give them a time limit, I guess, you know, on the police coming around, because they knew they would be back around, just like the case prior to this.

61

\* \* \* \*

Q.  Well, why didn't you leave and say, well, I've got to go back home, folks. I'm not staying here any longer, with your burned body burning out here in the yard?

A.  The same reason I didn't in the Dugger case.

\* \* \* \*

Q.  Would you be surprised to know that in a crematorium, in order to burn a body to ashes, that it takes two-and-a-half hours at 1,800 degrees Fahrenheit temperature to do that, in a confined furnace?

A.  I didn't realize how long it took or what the temperature was. But in order for them to burn the body, Pat explained that he had to get the temperature really hot. That's where he used the rubber from the plant. He described it at what temperature it would burn at. But it couldn't be done in two-and-a-half hours. In two-and-a-half days, yes, he did.

\* \* \* \*

Q.  You just now said, I believe, he told you it took two-and-a-half days?

A.  It did take two-and-a-half days. I had already witnessed one before that took two-and-a-half days.

Q.  Okay. And you said that he told you that this happened on the night of the seventeenth, after they got off from work, which would be on the morning of the eighteenth. A.M. Right?

A.  Yes, sir.

Q.  And then Sunday afternoon, which would be not even a day-and-a-half later, you saw -- you say you saw a lump smoking in Elkton.

A.  Yes, sir.

Q.  Which certainly wouldn't be any two-and-a-half days?

A.  Well, the first one, they didn't cut her up.

Q.  What's that?

A.  The first murder.

MR. JERRY COLLEY:  I'm going to object, Judge, and ask for a mistrial, right here.

THE COURT:  I'm going to overrule the motion for a mistrial. Just be responsive. Ask the question, again.

62

Subsequently, another jury-out hearing was held, and the trial court ruled that on redirect, Denise could testify that some of her meetings with authorities after the defendant was arrested concerned other matters not involved in this case and that she could explain why she was afraid of the defendant. No further references were made about the Dugger case during cross-examination.

On redirect, the following disputed testimony was given:

Q. Mrs. Bondurant, you have testified that between February, 1990, and today, that you have talked to Agent Coleman, to representatives of the District Attorney's office, and to other law enforcement people, a lot of times.

A. Yes.

Q. A number of times.

A. Yes.

Q. That you have talked with us maybe 15, 20 times. Maybe 25, I believe, in answer to Mr. Colley's questions. Have all of those conversations been about the Ronnie Gaines case?

A. No, sir, they have not.

Q. What have they been about?

A. Well, we have --

MR. JERRY COLLEY:     Objection. She said they weren't all about the Ronnie Gaines case.

THE COURT:     Well, I think you can do that a different way.

Q. BY MR. SANDERS: Let me ask you if they have been about other cases?

A. Yes, sir, they have.

Q. Has it been necessary for you to talk with the District Attorney's office, as a matter of fact, about other trials?

A. Yes, sir.

Q. Now, you were also asked about being afraid of your husband, Pat, and his brother, Pete, I believe you said?

63

A.  Yes.

Q.  Why, in October 1986, were you afraid of your husband, Pat, and his brother, Pete?

A.  Can I answer about the Dugger case?

MR. JERRY COLLEY:    Objection, if Your Honor please.

MR. SANDERS:   No, sir.  That's admissible.

MR. JERRY COLLEY:    Objection.

THE COURT:   I think she can answer that in one sentence.

MR. SANDERS:   Yes, sir.

Q.  Because of why?

A.  Because of the murder that had occurred prior to the Gaines case.

Q.  Now, in that particular case, had anything been said to you that you considered threatening?

A.  Yes, sir, it did.  It was said to me that --

MR. JERRY COLLEY:    I'm objecting to that, Judge.

THE COURT:   No, sir.  I'm going to allow that in.  Go ahead.

MR. JERRY COLLEY:    All right.

A.  That if I were to go to any law enforcement officials about what happened with the Dugger case, Mrs. Dugger being murdered there at the home, that Pete and Pat would blame the whole thing on me.  And he asked me if I wanted to have the baby in prison, which of course, I did not.  And he said, who would they believe?  Would they believe you or the two of us.

Q.  Now, in answer to one of Mr. Colley's questions, you said that he told you, 'he' being your husband, Pat Bondurant, united we stand and divided we fall.

A.  Yes, sir.  To him -- well, to me, that meant that as long as we three stood together, that nobody would go to jail.  But if one of them were to fall, we would all go to jail.


First, the defendant contends that the trial court erred by failing to grant a mistrial based on Denise's responses during direct and cross-examination.

The declaring of a mistrial is a matter "of great delicacy, in which the trial Court should act with caution, and that such action should be taken only when necessity

64

requires." Bellis v. State, 157 Tenn. 177, 180, 7 S.W.2d 46, 46 (Tenn. 1928). Although subject to review by appellate courts, the decision of whether to grant a mistrial is within the discretion of the trial court, and a reviewing court will not disturb that action absent a finding of abuse of that discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990).

Although the witness's initial reference to the Dugger case on direct examination was improper, the trial court sustained the defendant's objection. Moreover, Denise's references to the Dugger case during extensive cross-examination on whether she was actually afraid of the defendant did not rise to the level of creating a necessity for

a mistrial. As in State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992) (citing Tenn. R. App. P. 36(b), where the supreme court, in considering the effect of statements concerning prior criminal activity on the jury's verdict in a capital case, held that the admission of the evidence was harmless beyond a reasonable doubt when viewed in context of the entire record, we find that Denise's testimony concerning the Dugger trial was harmless error. See also State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985).

The defendant further contends that it was error to allow the state to question Denise on redirect about why she was afraid of the defendant and why she talked to authorities on numerous occasions. The admissibility of rebuttal proof lies in the discretion of the trial court. Hardin v. State, 210 Tenn. 116, 136, 355 S.W.2d 105, 114 (1962). As stated in State v. Lunati, 665 S.W.2d 739 (Tenn. Crim. App. 1983), "'[r]ebutting evidence' is evidence which tends to explain or controvert evidence produced by the adverse party." Id. at 747 (citations omitted).

Generally, evidence of prior criminal conduct is inadmissible, absent certain well-defined exceptions. See State v. Rounsaville, 701 S.W.2d 817, 820-21 (Tenn.1985); State v. Morgan, 541 S.W.2d 385 (Tenn.1976). The rule, which is embodied in Tenn. R.

Evid. 404(b), is premised upon recognition that such evidence may result in a jury improperly convicting a defendant for his bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. Anderson v. State, 165 Tenn. 569, 56 S.W.2d 731 (1933). This is particularly true when the prior conduct or acts are similar to the crimes on trial. See Long v. State, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). As our supreme court stated in State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citations omitted):

> The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. Such a potential particularity exists when the conduct or acts are similar to the crimes on trial.

The exceptions to this rule of exclusion relate to the probative value of such evidence on a legitimate issue in the trial being considered of greater worth than the danger of its prejudicial effect. Accordingly, evidence of prior bad acts may be used for a purpose other than to show a defendant's propensity to commit the crime for which he is charged, such as to demonstrate identity, intent, motive or a common scheme or plan, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); Tenn. R. Evid. 404(b).

In order to determine the admissibility of such evidence, compliance with the procedures provided in Rule 404(b) is mandatory. Without the trial court conducting the required analysis on the record, particularly regarding the existence of a material issue and the probative value of the evidence outweighing the danger of unfair prejudice, we cannot properly review its admissibility as an exception to the rule of exclusion. West, 844 S.W.2d at 150.

After defense counsel raised the issue during cross-examination, the trial court properly determined at the jury-out hearings that Denise could explain why she was afraid of the defendant and why she delayed contacting authorities concerning this murder. It was also proper for the trial court to determine that Denise could explain why she met

with authorities on numerous occasions.  She was questioned extensively about these matters during cross-examination, and the state was entitled to explain.

Moreover, pursuant to Tennessee Rule of Evidence 103(a), the admission or exclusion of evidence is not a basis for error unless the ruling affects a substantial right of the party.  We find that even if the trial court did err in allowing this testimony to be introduced, no substantial right of the appellant was affected thereby.  In light of the convincing evidence of the defendant's guilt, any error in the admission of this testimony was harmless.  See State v. Shelley, 628 S.W.2d 436, 438 (Tenn. Crim. App. 1981); Tenn. R. App. P. 36(b).  This issue, therefore, lacks merit.

Next, the defendant contends that it was error to allow Denise and Rodney Randolph to testify that Terri Lynn Clark, the defendant's alleged alibi witness, was found dead at the Elkton farmhouse where he and his brother lived.  In addition, he asserts that it was prosecutorial misconduct for the state to address the location of Clark's body during closing argument.  Finally, the defendant contends that defense counsel's failure to object to this testimony and argument constituted ineffective assistance.

On direct examination, Jerry Dickey, the arson investigator, testified that when he took the defendant's statement, the defendant told him that he had been with Terri Lynn Clark during the weekend when the victim disappeared.  Dickey advised the defendant that he would have to talk to Clark to verify the defendant's statement.  He then testified:

Q.    All right.  And where did you wind up going to try to contact
      Terri Lynn Clark, sir?

A.    To Elkton, Tennessee.

Q.    And where in Elkton, Tennessee?

A.    To what was known at the time, I think, as Pete Bondurant's
      house.

67

Q. And did you find Terri Lynn Clark?

A. Yes, sir.

Q. Did you take a statement from her?

A. No, sir.

Q. Why not?

A. She was dead.

Subsequently, during the state's cross-examination of defense witness, Rodney Randolph, the state asked him why he stopped living with Pete and the defendant at Elkton. Randolph responded:

A. Well, I had some clothes and stuff down there that -- work clothes that I stopped and changed clothes and stuff, as I was going to Ardmore, as my ride would pick me up to Ardmore. And about that time, Terri Lynn was found in the house, so I didn't go back for for(sic) like two or three weeks to get my clothes.

Q. Now, who is Terri Lynn?

A. Terri Lynn Clark.

Q. And was (sic) found in the house, how? What do you mean?

A. She was found, the way I understand it, she was found in the bed, dead.

During cross-examination of the defendant, the state asked him if his Elkton residence was the same "house they found Terri Lynn Clark in on November 17, one month after Ronnie Gaines' disappearance; two weeks after you told the officers that she was your alibi?" The fact of Clark's body being found at the farmhouse in Elkton was also raised during the state's closing argument in which the prosecutor stated that when Dickey started looking for Clark to verify the defendant's alibi, he ultimately found her "on November 17, 1986, at the home of Pat Bondurant's brother, in the bed, dead."

Trial counsel did not object to any of the references to Clark's body being found at the Elkton farmhouse. Accordingly, this issue has been waived. Tenn. R. App. P. 36(a). Regardless, we find that any error was harmless. Clearly, the fact of Clark's

68

death was relevant to establish that the defendant's alibi could not be corroborated.

Regardless, the admission or exclusion of evidence is not a basis for error unless the ruling affects a substantial right of the party. Here, the testimony did not directly implicate the defendant in the murder of Clark. In fact, there was no testimony regarding the circumstances or cause of her death. Moreover, Dickey testified that when he told the defendant he would have to confirm the defendant's alibi with Clark, the defendant said "that's okay." And the defendant, during cross-examination, testified that he had no knowledge concerning Clark's death. Moreover, as stated earlier, we find that the evidence of the defendant's guilt was abundant. Accordingly, any error was harmless in light of the overwhelming evidence of the defendant's guilt. See Shelley, 628 S.W.2d at 438.

As to the state's reference during closing argument to the location of Clark's body, we find this too was harmless error. The standard of review in determining whether the trial court allowed counsel too much latitude during closing argument is abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. Id. The prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses were believed by the jury. Brown, 836 S.W.2d at 552. Although improper and irrelevant, we do not find that the prosecutor's single comment during closing argument constituted reversible error. Furthermore, while counsel should have objected to these references concerning the location of Clark's body, we find that the defendant has failed to demonstrate prejudice. See Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. We find no reversible error in this issue.

## VIII. ADMISSIBILITY OF DEFENDANT'S PRIOR MURDER CONVICTION

The defendant argues that it was error to permit the state to cross-examine him about his second-degree murder conviction without giving written notice of its intent

69

to use the prior conviction for impeachment purposes and without holding a jury-out hearing on the probative versus the prejudicial value of the conviction. The defendant also submits that it was error to allow the state to introduce the judgment document into evidence after the defendant admitted he had previously been convicted of second-degree murder. Moreover, the defendant contends that the slight value of his prior homicide conviction on the issue of credibility did not outweigh its unfair prejudicial effect on the substantive issues. To the extent trial counsel failed to object, the defendant claims it was ineffective assistance of counsel.

During cross-examination of the defendant, the state asked whether the defendant had been convicted of second-degree murder in Giles County, Tennessee. In response, the defendant admitted the conviction. Then the state asked the defendant to identify the judgment document. Defense counsel objected, and the trial court sustained the objection. The state, however, was then allowed to enter the judgment into evidence without objection. No facts of the crime were included in the judgment document.

At the hearing on the motion for new trial, trial counsel testified that he did not ask for a jury-out hearing because he assumed the second-degree murder conviction was admissible for impeachment purposes. In fact, the potential use of this previous conviction for impeachment purposes was considered by counsel in determining whether the defendant should testify on his own behalf.

Pursuant to Tennessee Rules of Evidence 609, the state may use a prior conviction to impeach a defendant during cross-examination if the conviction meets the following criteria: (a) the conviction was for a crime punishable by death or imprisonment in excess of one year or a misdemeanor conviction involving dishonesty or a false statement, (b) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the prosecution, (c) the state must give reasonable written notice of the particular convictions it intends to use to impeach the accused prior to trial, and (d) the trial court must find the probative value of each

conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). A conviction may only be established by public record if the witness denies having been convicted. Tenn. R. Evid. 609(a)(1). "The purpose of determining the admissibility of [evidence of a defendant's criminal convictions] prior to the accused's testimony is to allow a defendant to make an informed judgment as to whether to testify." State v. Williams, 929 S.W.2d 385, 391 (Tenn. Crim. App. 1996) (quoting State v. Hugh Williams, No. 02C01-9209-CR-00220, slip op. at 24 (Tenn. Crim. App., Jackson, Oct. 12, 1994)).

In the present case, the state failed to give the defendant reasonable written notice of its intent to use the second degree murder conviction for impeachment purposes, and neither party requested a jury-out hearing on the admissibility of the conviction prior to the defendant taking the stand. Tenn. R. Evid. 609(a)(3); see Farmer, 841 S.W.2d at 839. However, on the facts of this case, we hold that this error was not fatal.

Where the state has failed to live up to its procedural duties, but the defendant is nevertheless on notice before the trial that he may be impeached by his prior convictions, this court has looked to whether the defendant has suffered prejudice as a result of the state's shortcomings. For example, in State v. Barnard, 899 S.W.2d 617 (Tenn. Crim. App. 1994), the state sent a discovery response to defense counsel setting forth the defendant's criminal record. The state did not, however, file a written notice of its intent to use one of the convictions for impeachment. This court held that the defendant had not been "unduly prejudiced" by the state's failure to comply with Rule 609(a)(3) and that the error was harmless. Id. at 622. Similarly, in State v. Burl Lakins, No. 32 (Tenn. Crim. App., Knoxville, May 24, 1991), the state filed its notice of intent to impeach the defendant with prior convictions at 4:30 on the afternoon before trial and notified defense counsel in a telephone call that night. Although defense counsel was aware of his client's prior conviction, he assumed the state did not intend to use the prior conviction as impeachment evidence because it had not so notified him in response to his pre-trial discovery request. Id., slip op. at 4. The trial court allowed the impeachment, despite the

71

technical shortcoming of the state. When the defendant complained of this action to this court, we found he waived consideration of the notice issue by failing to raise it in his motion for new trial and by failing to cite authority to support his argument in his appellate brief. Id., slip op. at 6. Notwithstanding waiver of the issue, we went on to find the defendant failed to show he was prejudiced by the late notice, focusing on defense counsel's awareness of the prior conviction. Id., slip op. at 7.

In the case now before us, we fail to find error requiring reversal on this issue for two reasons. First, defense counsel failed to object to the prosecution's cross-examination of the defendant regarding his prior conviction. Under the authorities cited above, this inaction was a waiver of the issue for purposes of our review. See Tenn. R. App. P. 36(a). Second, the defendant has suffered no prejudice by the state's failure to follow Rule 609(a)(3). The defendant has made no claim that he would not have testified had he known his testimony was subject to impeachment via the prior murder conviction. In fact, trial counsel testified he was aware of the defendant's prior conviction, he thought it likely the evidence would be admitted for impeachment purposes, and he counseled the defendant to be prepared to be questioned about the prior conviction if he chose to testify. Moreover, in overruling the defendant's motion for new trial, the trial judge stated that he found no error in the failure to hold a jury-out Rule 609 hearing, noting "the probative value of this testimony was so high as to be obvious to all parties and that a hearing outside the presence of the jury would not have resulted in a different opinion." Thus, the defendant was not deprived of the opportunity to make an "informed judgment" as to whether to testify, see Williams, 929 S.W.2d at 391, nor would the admission of the impeaching conviction have been disallowed had a hearing been held. Although we do not condone the state's failure to meet its obligations, especially in a capital case, we fail to see how this shortcoming prejudiced the defense, given the particular facts of this case.

With respect to the prosecution's introduction into evidence of the judgment document from the prior proceeding, we find the defendant waived any complaint to its admission by his failure to lodge a contemporaneous objection. See State v. Harrington,

72

627 S.W.2d 345, 348 (Tenn. 1981). Also, the judgment document did not convey specific facts about the prior case, and any error that may have been committed when the document was introduced was undoubtedly harmless. Tenn. R. App. P. 36(b).

Next, the defendant alleges with respect to the Rule 609 issue that his trial counsel rendered ineffective assistance through taking no action to block the impeachment use of the prior murder conviction. Assuming, arguendo, that trial counsel's failure to request a Rule 609(a)(3) hearing or otherwise to object to the attack on the defendant's credibility through the use of the previous murder conviction constitutes ineffective assistance of counsel, we nevertheless hold that the defendant has failed on appeal to show that such ineffectiveness prejudiced him under the second prong of the Strickland test. We find that this conclusion is supported by either of two bases. Essentially, there is no Strickland prejudice because (1) had counsel obtained a pre-impeachment, balancing-test review, the result on the use of the conviction would have been the same, and (2) the defendant has failed to show that, even without the impeachment via the prior conviction, the verdict would have been different.

As to the first basis, we noted above that the trial judge indicated he would have allowed the use of the prior conviction for impeachment purposes. Had the trial court so ruled, the defendant on appeal would have been met by the well-established rule that issues concerning the admissibility of evidence rest within the sound discretion of the trial court and an appellate court will not interfere with the exercise of this discretion absent a clear abuse appearing on the face of the record. State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). These rules have been applied to trial court determinations under Rule 609. State v. Sheffield, 676 S.W.2d 542, 549 (Tenn. 1984) (applying Fed. R. Evid. 609, under State v. Morgan, 541 S.W.2d 385 (Tenn. 1976)); State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996); State v. Tune, 872 S.W.2d 922, 927 (Tenn. Crim. App. 1993); State v. Robert Harrison Blevins, No. 03C01-9606-CC-00242 (Tenn. Crim. App., Knoxville, May 23, 1997); State v. Jerry Lee Finch, No. 02C01-9309-CC-00224 (Tenn. Crim. App., Jackson, June 7, 1995), perm. app.

73

denied (Tenn. 1995).  Thus, in order to show that he was prejudiced by ineffective assistance of counsel on this issue, the defendant would be required to show that the trial court, in allowing the impeachment evidence, would have committed a clear abuse of discretion.  Although the trial judge provided no insight into his theoretical ruling, we note that caselaw exists to support a decision to admit the evidence.  See State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984); State v. Blanton, 926 S.W.2d 953 (Tenn. Crim. App. 1996); State v. Stafford, 670 S.W.2d 243 (Tenn. Crim. App. 1984) (prior to adoption of Tennessee Rules of Evidence); State v. Roman Earl Warner, No. 02C01-9204-CC-00078 (Tenn. Crim. App., Jackson, July 21, 1993); State v. Burl Lakins, No. 32 (Tenn. Crim. App., Knoxville, May 24, 1991);  State v. Milburn Greene, No. 317 (Tenn. Crim. App., Knoxville, Nov. 7, 1990).  The impeaching conviction need not intrinsically suggest "dishonesty or false statement," Blanton, 926 S.W.2d at 960 (Tenn. Crim. App. 1996); Tune, 872 S.W.2d at 927 (Tenn. Crim. App. 1993), such that, in balancing the probative value as to credibility against the unfair prejudicial effect as to the substantive issues, the trial court may consider whether the prior conviction involves "disregard of legal and moral rules of civilized society . . . serious enough to be punishable by imprisonment in excess of one year."  State v. Sheffield, 676 S.W.2d at 549.  See also Blanton, 926 S.W.2d at 960.  In light of such considerations,  the defendant has not shown that the trial court would have clearly abused its discretion had it ruled to allow the impeachment evidence.[6]

---

[6]We realize that Sheffield and other cases cited herein that were tried before January 1, 1990, the effective date of the Tennessee Rules of Evidence, were adjudicated without reference to the Rules, being governed instead by our supreme court's ruling in State v. Morgan, 541 S.W.2d 385 (Tenn. 1976).  In Morgan, the court adopted the provisions of Federal Rules of Evidence 608(b) and 609(a) and (b).  With respect to prior convictions used to impeach a witness, the provision adopted allowed the use of the prior conviction if the "crime (1) was punishable by death or imprisonment in excess of one year . . . and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment."  Morgan, 541 S.W.2d at 388-89.  Under Tennessee Rule of Evidence 609(a)(3), when the assailed witness is the accused in a criminal case, any conviction offered to impeach the defendant-witness is subject to the trial court determining if the conviction's "probative value on credibility outweighs its unfair prejudicial effect on the substantive issues."  Tenn. R. Evid. 609(a)(3) (emphasis added).  As noted by the defendant in his brief, the Advisory Commission Comments to this rule say, "To the extent that State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984), is inconsistent, the proposal would change the result."  Tenn. R. Evid. 609, Advisory Comm'n Comment.

Furthermore, we are aware of Rule 609-based case law that supports the defendant's argument that the impeachment should have been disallowed.  In State v. Farmer, 841 S.W.2d 837 (Tenn. Crim. App. 1992), a murder prosecution, this court reviewed the impeachment of the defendant-witness through the use of a prior conviction for assault with intent to commit voluntary manslaughter.  The court stated that the trial court, in such a situation, should (a) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction" and (b) "analyze the relevance the impeaching conviction has to the issue of credibility."  Farmer, 841 S.W.2d at 839 (citing N. Cohen, D. Paine and S. Sheppeard, Tennessee Law of Evidence, § 609.9 at p. 288 (2d ed. 1990)).  In Farmer, the court found it "obvious" that the use of the prior conviction was error, although the court did determine the error to be harmless "given the facts and circumstances of this

case." Id. at 840. See also State v. Summerall, 926 S.W.2d 272 (Tenn. Crim. App. 1995); State v. Steve Johnson, No. 02C01-9504-CC-00097, slip op. at 7 (Tenn. Crim. App., Jackson, February 27, 1997); State v. Jerry Lee Finch, No. 02C01-9309-CC-00224 (Tenn. Crim. App., Jackson, June 7, 1995), perm. app. denied (Tenn.).

Finally, we recognize the additional language engrafted into the Morgan balancing test by the Tennessee Rules of Evidence causes more focus upon a tension between the issue of credibility on the one hand and prejudice to the substantive issues on the other hand. However, the very purpose of the Morgan-federal rule was witness impeachment--"'attacking the credibility of a witness."' Morgan, 541 S.W.2d at 388 (quoting Fed. R. Evid. 609(a)). Thus, the augmentation of Tennessee Rule 609(a)(3) by adding "on credibility" is not in itself significant. The Tennessee Rule requirement that the court assess the "unfair prejudicial effect on the substantive issues" is more instructive, but arguably what is given through the use of the prepositional phrase "on the substantive issues" is somewhat taken away by modifying the phrase "prejudicial effect" by the adjective "unfair," for in proclaiming that it is the effect on the substantive issues that must be analyzed, the Rule acknowledges that some prejudice is fair and, hence, acceptable. The long and short of it is that if Tennessee Rule 609(a)(3) purports to change the result in Sheffield, as the Advisory Commission Comments suggests, the Rule itself fails to do so explicitly. But see N. Cohen, D. Paine, and S. Sheppeard, Tennessee Law of Evidence, § 609.9 at 376 (3 ed. 1995). Certainly, the rule does not limit the use of impeaching felonies to cases involving "dishonesty or false statement," as is the case with impeaching misdemeanors. See Tenn. R. Evid. 609(a)(2).

As a result, a much-maligned Sheffield may yet retain some viability on this issue. We emphasize that in Sheffield our supreme court did apply the Morgan balancing test that was drawn from Federal Rule of Evidence 609. Although the Tennessee rule adopted in 1990 featured the above-described (and other) changes, the Sheffield court applied the same type of analysis contemplated by Tennessee Rule of Evidence 609. In fact, the supreme court in Sheffield applied the first prong of the test that was later promulgated in Farmer, acknowledging that "the predominant consideration in weighing the admissibility of the manslaughter conviction was the similarity between that prior conviction and the crime for which defendant was on trial." 676 S.W.2d at 549. Also the court dealt with the relevancy of the impeaching conviction on the issue of credibility; however, it is from this point that Sheffield and Farmer take divergent paths. In Sheffield the court said, "We had no intention [in Morgan] of limiting the use of prior convictions to those crimes involving dishonesty or false statement and imposing such limitations on the determination of the probative value versus the prejudicial effect . . . so that only crimes that involve a very close relationship to dishonesty or false statement would be embraced therein." Sheffield, 676 S.W.2d at 549. The court approved the use of a prior manslaughter conviction to impeach the defendant-witness on trial for murder, and while the court acknowledged that the issue presented "a very close result," it found it was "unable to say that the trial judge abused his discretion in allowing the State to use the voluntary manslaughter conviction for impeachment purposes." Id. On the other hand, the Farmer approach degrades the impeachment quality of the prior conviction if the conviction does not intrinsically suggest dishonesty or false statement. For comparison, see, e.g., Steve Johnson, slip op. at 7; State v. Harry Garvin, Jr., No. 02C01-9308-CC-00193, slip op. at 1 (Tenn. Crim. App., Jackson, October 12, 1994).

Under Sheffield, the extra-dishonesty evidence that may justify impeachment is a prior conviction that shows "disregard of legal and moral rules of civilized society and serious enough to be punishable by imprisonment in excess of one year." Sheffield, 676 S.W.2d at 549. While this rubric sounds like a threshold for injecting propensity evidence, we believe the court in Sheffield was ruminating about impeaching credibility as an end result, although mounting a credibility attack through disparaging one's moral fitness (a return to moral turpitude?) concededly calls for a narrow and fine distinction from propensity evidence. Still, as noted above, Tennessee Rule 609(a) does not limit the impeachment use of felonies to those convictions that involve dishonesty or false statement.

Some clues exist to suggest the survival of Sheffield. First, it is a decision of the highest court of our state that per se has not been overruled. Second, while the legal conclusion reached may be at variance with the conclusion in Farmer, Sheffield in a sense is not inimical to the two-pronged test adopted in Farmer, although, under Farmer's second prong, the relevance test for the impeaching conviction on the issue of credibility is more liberal under Sheffield. Third, post-Rule caselaw--in fact, caselaw that is subsequent to Farmer--indulges the trial court's discretion in allowing the prior evidence, even though the prior conviction offense did not involve dishonesty per se and the impeaching offense was similar to the offense on trial. In Blanton, 926 S.W.2d 953, a prosecution for aggravated rape, this court approved the trial court's admission of the potential defendant-witness' prior murder conviction. We held that there was sufficient dissimilarity to preclude unfair prejudice, but we further commented that "this court has held that 'felonies of a violent nature reflect on the moral character of a witness'; and, therefore, 'this evidence is not usually without probative value.'" Blanton, 926 S.W.2d at 960 (quoting State v. Wiggins, 729 S.W.2d 291, 294 (Tenn. Crim. App. 1984), a pre-rule case). "Accordingly," we said in Blanton, "we conclude that the trial court did not err in finding the appellant's conviction for second degree murder more probative as to credibility than prejudicial as to a substantive issue." Blanton, 926 S.W.2d at 960 (emphasis added). See State v. Collier V. Harris, No. 02C01-9612-CR-00447, slip op. at 3-9 (Tenn. Crim. App., Jan. 15, 1998) (affirming trial court's Rule 609 decision, in a rape case, to allow impeachment of the defendant witness via a prior murder conviction, commenting that "[t]he mere fact a prior conviction of the

Second, <u>Strickland</u> prejudice is not present because there was no showing that, had the prior conviction not been used, the verdict on guilt would have been different. The evidence against the defendant was prodigious. According to the state's evidence, the defendant expressed his animosity for the victim to his wife and later admitted having killed the victim to his wife and a co-worker. Bone fragments were found in an area where the defendant told his wife he had burned the victim's body. The murder weapon the defendant told his wife he used, a small rocking chair, was missing from the victim's home after the victim's disappearance. The defendant admitted being with the victim on the evening the state theorized the victim was murdered, and the defendant endorsed the victim's paycheck on the same date. The defendant's alibi for the time of the murder could not be corroborated. Moreover, the defendant's prior conviction was not the cornerstone of the state's impeachment of him. To be sure, the defendant gave conflicting extra-judicial statements, and his trial testimony further conflicted with his pre-trial statements. Through his own inconsistency, he demonstrated his lack of credibility. Furthermore, the record reflects that several of the jurors who were accepted by the defense and who ultimately sat on the jury panel were aware of the defendant's prior second-degree murder conviction or the facts which gave rise to it. Given the state's mountain of evidence against the defendant, the defendant's comparatively implausible testimony (particularly in light of his contradictory pre-trial statements), and the jury's independent awareness of the

accused is identical or similar to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness," and finding no abuse of discretion). In <u>Tune</u>, 872 S.W.2d 922, this court observed that under Rule 609(a)(3) a crime punishable by death or imprisonment in excess of one year may be admissible "<u>regardless of whether the crime involved dishonesty or false statements</u>," so long as the balancing test is met. <u>Tune</u>, 872 S.W.2d at 927. Moreover, we relied upon <u>Sheffield</u> in <u>Tune</u> for the proposition that there are no "specific guidelines to be used by trial judges in weighing the probative value of convictions against their prejudicial effect," such that the issue is properly entrusted to "the discretion of the trial judge who is in the best position to make such an evaluation." <u>Tune</u>, 872 S.W.2d at 927 (citing <u>State v. Sheffield</u>, 676 S.W.2d at 548-9). (In <u>Tune</u>, we found the determination to be within the trial court's discretion and left undisturbed that court's ruling that prior drug convictions were admissible for impeaching the defendant-witness in a prosecution for murder.)

There is consensus in the cases, at least, for the rule that the decision whether to admit evidence under Rule 609(a)(3) is entrusted to the discretion of the trial court. <u>Sheffield</u>, 676 S.W.2d at 549; <u>Blanton</u>, 926 S.W.2d at 960; <u>Robert Harrison Blevins</u>, slip op. at 9; <u>Jerry Lee Finch</u>, slip op. at 7. In this footnote we have reviewed the currency of some caselaw which supports the theoretical Rule 609 decision of the court below that the defendant's prior conviction would be admissible. The existence of such caselaw tends to anchor the lower court's decision within the range of its allowable discretion. This is true despite commentary to Rule 609 that disparages the <u>Sheffield</u> approach to impeaching the defendant-witness through a prior conviction for an offense similar to the crime on trial, when the prior offense is not intrinsically suggestive of dishonesty, and despite the emergence of caselaw that reaches a conclusion seemingly at odds with <u>Sheffield</u>.

defendant's criminal past, we are convinced it is not probable the outcome of the trial would have been different if this line of impeachment had not been pursued. See Strickland, 466 U.S. at 693, 104 S.Ct. at 2065. As such, defendant's claim of ineffective assistance in this regard must fail.

## IX. JURY INSTRUCTIONS AT SENTENCING PHASE

The defendant raises several challenges to the trial court's instructions to the jury during the sentencing phase. First, he contends that the trial court erred by instructing the jury on the heinous, atrocious, or cruel aggravating factor. Specifically, the defendant argues that the evidence was insufficient to support a finding of either torture or depravity of mind and that the definitions given in the jury charge were unconstitutionally vague and overbroad and did not provide the jury with adequate guidance in applying this aggravating factor.

The jury was instructed on the heinous, atrocious, or cruel aggravating circumstance as set forth in Tennessee Code Annotated section 39-2-203(i)(5)(1982),[7] which provided that the murder was heinous, atrocious, or cruel in that it involved torture or depravity of mind. The trial court gave the following charge:

> You are hereby instructed that the word, heinous, means grossly wicked or reprehensible, abominable, odious, vile. Atrocious means extremely evil or cruel, monstrous, exceptionally bad, abominable. Cruel means disposed to inflict pain or suffering; causing suffering, or painful. Torture means the infliction of severe physical or mental pain upon the victim, while he or she remains alive and conscious. And depravity means moral corruption, wicked, or perverse acts.

Our supreme court has consistently held that the language of Tennessee Code Annotated section 39-2-203(I)(5)(1982) is not unconstitutionally vague or overbroad. State v. Dicks, 615 S.W.2d 126, 131-32 (Tenn.); See also State v. Black, 815 S.W.2d 166,

---

[7]Tennessee Code Annotated section 39-13-204(I)(5), effective November 1, 1989, states that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Although the trial was held in 1991, the murder was committed in 1986. Accordingly, the jury was properly charged as to the "torture or depravity of mind" standard in existence at the time of the crime. See State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743, 130 L.Ed.2d 644 (1995); State v. Smith, 893 S.W.2d 908, 920 (Tenn. 1994), cert. denied, --- U.S. ----, 116 S. Ct. 99, 133 L.Ed.2d 53 (1995).

181 (Tenn. 1991); State v. Barber, 753 S.W.2d 659, 670 (Tenn.).  Specifically, in State v. Williams, 690 S.W.2d 517 (Tenn. 1985), our supreme court found the statute to be constitutional "so long as the abstract terms employed therein are construed and interpreted" as set forth in its opinion. Id. at 533.  The trial court in Williams failed to "instruct the jury concerning the legal significance of the words 'heinous,' 'atrocious,' 'cruel,' 'torture,' or 'depravity of mind' as those terms are used in the aggravating circumstance defined in Tennessee Code Annotated section 39-2-203(i)(5)." Id. at 532.  The Court determined that jury instructions on the definitions are necessary to preclude "a basically uninstructed jury" that "cannot lawfully impose the death penalty." Id. (citing Godfrey v. Georgia, 446 U.S. 420, 429, 100 S. Ct. 1759, 1765 (1980)).  In the present case, the trial court clearly instructed the jury in accordance with the dictates of Williams.

The defendant's reliance on Houston v. Dutton, 50 F.3d 381, 387 (6th Cir.), cert. denied, --- U.S. ---, 116 S. Ct. 272, 133 L.Ed.2d 193 (1995), and Rickman v. Dutton, 854 F. Supp. 1305, 1309-10 (M.D. Tenn. 1994), is also without merit.  These cases are distinguished in that the definitions of "torture" and "depravity" were not supplied to the jury in those cases. Regardless, this court is not bound by the circuit and district courts' rulings. This Court is only required to follow the applicable constitutional rulings of the United States Supreme Court. See State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984); State v. Bowers, 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984). See also, State v. Vickers, 159 Ariz. 532, 768 P.2d 1177, 1188 n.2 (1989) (Arizona Supreme Court refuses to follow Ninth Circuit's invalidation of Arizona death penalty statute).

In addition, the defendant's other constitutional challenges to the jury instructions at the sentencing hearing have all been rejected by our supreme court and are without merit. See, e.g., State v. Brimmer, 876 S.W.2d 75, 81-83, 87 (Tenn. 1994); Cazes, 875 S.W.2d at 268-69; Howell, 868 S.W.2d at 257-58; Smith, 857 S.W.2d at 22-23; Harris, 839 S.W.2d at 75; State v. Boyd, 797 S.W.2d 589, 598 (Tenn. 1990); Thompson, 768 S.W.2d at 250-52; State v. Barber, 753 S.W.2d 659, 670-71 (Tenn. 1988).

78

## X. INEFFECTIVE ASSISTANCE OF COUNSEL

In another issue, the defendant raises several claims of ineffective assistance of counsel. Some of these have already been addressed in conjunction with the substantive issues. We find the defendant's claims demonstrate no basis for reversible error.

As we explained above, when a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter, 523 S.W.2d at 936. Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. There must be a reasonable probability that but for counsel's error, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Best, 708 S.W.2d at 422. Should the defendant fail to establish either factor, he is not entitled to relief.

Moreover, on appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991); Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the defendant to show that the evidence preponderates against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

After the initial motion for new trial was filed in this case, counsel was substituted, and new counsel raised and presented proof on the issue of ineffective assistance of trial counsel at the hearing on the motion for new trial.

Jerry Colley, lead trial counsel, testified that he had practiced law for 43 years. He was appointed to represent the defendant in May 1991. On October 1, 1991,

he filed an ex parte motion requesting funds for associate counsel and for an investigator. After the motion was granted, Dan White was hired as an investigator. Lawrence Nickell was originally appointed as co-counsel; however, he became ill after November 13, 1991, and Jerry Colley's son, John Colley, was appointed. As co-counsel, Nickell researched the law, filed motions, and sometimes appeared with Jerry Colley in court. John Colley did most of the research after he was appointed.

Shortly after Jerry Colley was appointed as counsel, he received a letter from Robert D. Massey, who served as Public Defender for the Twenty-Second Judicial District from September 1987 to August 1992 and who represented Pete Bondurant in the Dugger trial. In his letter, Massey indicated that he and Bobby Sands, who represented the defendant in the Dugger trial, had relevant information for this trial, offered his assistance, and suggested that counsel contact CCRC. Colley talked to Sands and to Massey about the Dugger case. He later received another letter from Massey along with a group of the defendant's medical reports from the Tennessee Department of Correction (TDOC). While Colley looked at these records and considered whether they would be helpful at the guilt phase, he did not introduce them at trial, nor did he investigate them further. A TDOC diagnostic report was included in the evidence at the hearing on the motion for new trial.

The rate of attorney compensation was $30 for in-court hours and $20 for out-of-court hours. Colley testified that the low compensation did not affect his ability to provide adequate representation of the defendant and that he spent a substantial amount of time on the case. He believed he did virtually everything he should have done.

As part of his investigation, White talked to potential witnesses and reported to Colley. If they decided to use a witness, Colley would call the person. Colley's defense theory was that the defendant was innocent. From his investigation, Colley did not believe the defendant had a motive to kill the victim and thought there was a reasonable doubt concerning whether the defendant committed the murder. Colley thought they had a good chance of getting a not guilty verdict or a hung jury because the state would have a

problem proving the defendant's guilt beyond reasonable doubt. Even after reviewing the discovery, Colley believed their best strategy was reasonable doubt. He testified, "I thought we had a good chance of at least a hung jury or a not guilty verdict, and I was going for broke on that."

When Colley met with the defendant at TDOC, Colley was operating on a theory of reasonable doubt acquittal and communicated this theory to the defendant. During their conversations, Colley questioned the defendant and thought that, if there had been a contrary factual version of the alleged crime, the defendant would have told him. Colley never directly asked the defendant if he killed the victim, nor did he encourage the defendant to say that he was involved. In fact, Colley testified that his optimism and enthusiasm about their chances could have discouraged the defendant from saying he was involved in the murder.

Colley recognized that Denise's testimony was important to the state's case because she was the only one that testified about the details of the murder. He also knew Denise had been a key witness in the Dugger trial, however, he did not obtain a copy of her testimony. Nor did he know about or obtain a copy of a videotape of the Dugger trial. Although the other attorneys may have told him about what they used to impeach Denise in the Dugger trial, Colley did not know about such documents or information and did not think he used any of it. Colley testified that he did not look at a list of money paid to Denise, her immunity agreement, her certified convictions in Tennessee and Alabama, or her juvenile record. He was aware of the worthless checks used for impeachment of Denise Bondurant in the Dugger case; however, he was not interested in those because he did not want to question her regarding her testimony in the Dugger case, even though he acknowledged that the door would not have been opened to the facts of the Dugger case if he had impeached Denise with these materials.

White was not instructed to investigate in preparation for the sentencing hearing. Colley talked to the defendant and his parents before and during the trial about

the defendant's life, his drinking habits, his work ethic, and his family life, but it was not for the purpose of having them testify, and he admitted that these conversations were not with the idea that he was going to use the information at sentencing.

Colley testified he was not planning on going to the sentencing stage because he was confident enough about the trial. Other than talking to the defendant's mother while the jury was deliberating in the guilt phase, Colley testified that he did not do anything to prepare for the sentencing hearing.

John Colley was admitted to the bar in October 1986 and practiced law with his father. Prior to Nickell becoming unavailable, John Colley assisted his father on this case, including research on a motion to dismiss based on a speedy trial issue. John Colley filed the memorandum in support of a marital privilege motion and the motion to suppress. The weekend before trial, John Colley started working on his cross-examination of the state's expert witness, Dr. Bass, and he worked on the motion to suppress, which was argued that Monday morning.

During November and December of 1991, John Colley's calendar was filled with court appearances, appointments, and depositions, and he only joined Jerry Colley in this trial when he was not scheduled to be somewhere else. He admitted that he could not afford to neglect the firm's other business by working too much on this case. John Colley was not aware of and did not participate in any preparation for the sentencing hearing. He remembered having at least one conversation with Massey, who said he had a lengthy list of mitigating factors that would apply to the defendant; however, this information was never pursued.

Massey talked on the phone with Jerry Colley about this case and offered information that could be used in mitigation. However, Colley said he did not feel like he was going to get to sentencing, that he was going for an acquittal. The public defender's office did fax some information about sentencing to the Colleys' office while the jury was

out in the guilt phase. However, Colley never asked prior to trial for information regarding mitigating proof or regarding what needed to be done at the sentencing hearing.

In denying the motion for new trial, the trial court made the following findings on this issue:

> The Court has examined each and every instance cited by Defendant and disagrees with Defendant that he received ineffective assistance in any manner. Defendant was represented by one of the most experienced and talented defense attorneys in this State. It was his theory of the case, joined in by the Defendant that their best defense lay in casting reasonable doubt on the State[']s case. They worked at that theory throughout the trial and most of the incidents now raised as constituting ineffective assistance of counsel result from that trial strategy. The Court finds this issue to be without merit and it is overruled.

### A. Commencement of Representation.

First, the defendant argues that he was unrepresented by counsel for one year from being indicted. The defendant points out that he was indicted on May 19, 1990, and arraigned on June 22, 1990. At the arraignment, his attorney in the Dugger case, Bobby Sands, stood with him but did not enter an appearance. Jerry Colley, lead trial counsel in this case, testified that his first activity in the case was in May of 1991, approximately six months before the trial.

The defendant does not allege that he requested an attorney during the time he was unrepresented. Moreover, he does not show how he was prejudiced by this gap in representation, nor does he cite authority on the point.

It may well be doubted that a criminal defendant is instantly entitled to counsel upon entering the courtroom for the court to ascertain his identity and his indigency status in order that counsel may be appointed for him. See State v. Miller, 668 S.W.2d 281, 286 (Tenn. 1984). Regardless, even assuming the defendant was entitled to counsel once he had been indicted, see State v. Mitchell, 593 S.W.2d 280, 286 (Tenn.1980), the absence of counsel here does not necessarily require that the conviction be set aside. See State v. Sutton, 761 S.W.2d 763, 769 (Tenn. 1988). A reversal is only dictated when

counsel is denied at some stage in the proceedings "in which opportunities are lost, substantive or procedural rights are waived, or some action is not taken and the consequences cannot be discerned from the record." Id. at 769.

In Brady v. State, 584 S.W.2d 245, 250 (Tenn. Crim. App. 1979), this court held that adequate preparation time depends on each individual case. We find that counsel had adequate time to prepare for trial. Moreover, we find that no rights were lost between the time of the defendant's arraignment and the appointment of counsel.

**B. Absence of Effective Co-Counsel.**

Next, the defendant submits that lead counsel was essentially without co-counsel, making him ineffective. Original co-counsel researched issues and made some pre-trial appearances; however, he became ill and was relieved as counsel on the Friday before trial. Trial counsel's son, John Colley, was then appointed as co-counsel. Although he already had a full schedule and only came to the trial when his schedule permitted, he worked on several of the important motions, and he cross-examined the state's expert witness. We find that the defendant has failed to show deficient performance or prejudice.

Lead counsel was supported at various times both prior to and during trial by John Colley, Dan White, Bob Massey, and Larry Nickell. He also had contact with Skip Gant at CCRC. The fact that lead counsel, who had 43 years of experience, did not share the burden of representing the defendant equally with another in no way presents a case for deficient performance. Moreover, the trial court observed that lead counsel was "one of the most experienced and talented defense attorneys in this State." The evidence does not preponderate against the trial court's finding. See Clenny, 576 S.W.2d at 14.

**C. Guilt Phase Strategy, Investigation.**

The defendant argues next that trial counsel's defense theory of reasonable doubt was based on counsel's failure to fully investigate his client and the case. Specifically, the defendant contends that adequate investigation would have revealed that

84

at the time of the murder, the defendant was living under stressful circumstances, he suffered from extreme alcohol and drug dependency, he suffered debilitating physical ailments, and he was intoxicated at the time of the offense, limiting his judgment and rendering him incapable of premeditated and deliberate murder.  Thus, the defendant argues that the decision not to pursue a mental capacity defense at the guilt stage was not an informed decision due to trial counsel's failure to investigate his client's mental state. The defendant goes on to argue that trial counsel's failure to investigate was exacerbated by the fact that the evidence of the defendant's involvement in the murder was strong.

Trial counsel's decision to pursue a reasonable doubt defense was clearly a strategic choice.  Moreover, we find that trial counsel's decision to pursue this defense, after reviewing the defendant's TDOC medical records and determining that additional investigation was unnecessary, was a reasonable decision as to the guilt phase.  Trial counsel investigated all potential witnesses, discussed the case with the defendant, and talked with attorneys Massey and Sands.  The defendant never indicated to trial counsel that he committed the murder, and counsel was under no obligation to press his client to confess.  During his interviews with the defendant, trial counsel never saw the defendant behave in a way that indicated to counsel he should pursue a mental capacity defense.

Standing alone, the fact that a particular strategy or tactic failed or hindered the defense does not establish unreasonable representation. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996).  Courts must give deference to strategic and tactical choices if they are informed ones based on adequate preparation.  Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).  In the present case, the proof was all circumstantial, and it was not unreasonable for counsel to pursue a strategy of poking holes in the state's case.  We find that counsel's  strategic decision to follow a reasonable doubt defense and not to pursue a mental incapacity defense was reasonable.

As a related issue, the defendant contends that trial counsel was ineffective by failing to accept available assistance. The defendant points to counsel's failure to take

advantage of assistance offered to him by District Public Defender Robert Massey and by Capital Case Resource Center (CCRC). The defendant has neither shown that counsel's failure to fully utilize these resources was deficient nor that the claimed deficiency was prejudicial.

### D. Failure to Impeach Key Witness.

Next, the defendant argues that trial counsel failed to investigate or take advantage of available documents and information that could have been used to impeach the testimony of Denise, the only witness who testified as to the details of the murder. Specifically, the defendant points to several materials that were used in the Dugger trial to impeach Denise's credibility, including a fabricated application for an apartment lease filled out by Denise, an immunity agreement given to Denise in return for her cooperation, a list of money paid to or on behalf of Denise during the investigation, certified convictions from Alabama and Tennessee, her juvenile record, information about forged and worthless checks, and information that Denise had used aliases to obtain prescription drugs.

Massey offered to provide the same documentation and information to Colley, who did not pursue it for use in this case. Clearly, failing to explore the use of these documents and information in order to impeach Denise, the state's only witness concerning the facts and circumstances of the murder, fell below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936.

We find, however, that the defendant has failed to show prejudice and is entitled no relief. See Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. At trial, Denise admitted on the stand that she had lied to law enforcement officers when they initially questioned her about the victim's disappearance, that she had used drugs, and that she had been involved in the cover-up of this murder, albeit due to her fear of the defendant. It is clear from our review of the record that Denise's character did not remain untarnished. While trial counsel should have investigated further all possible impeachment information, especially since it had already been collected for use at the Dugger trial, we do not find that

86

the defendant was prejudiced by this failure.

**E. Failure to Prepare for and Present Evidence at the Sentencing Hearing.**

Next, the defendant argues that trial counsel was ineffective by failing to expect, anticipate, or prepare for the sentencing hearing.

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S. Ct. 2658, 2666 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S. Ct. 837, 839 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982).

There is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly seen fit not to offer any evidence at the penalty phase. Melson, 772 S.W.2d at 421 (citations omitted); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985).

However, "[a] strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless." Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir.1986). Courts have held counsel's representation beneath professionally competent standards when sentencing counsel did not conduct enough investigation to formulate an "accurate life profile" of a defendant. Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir.), cert. dismissed sub nom. Jackson v. Jones, --- U.S. ---, 116 S. Ct. 38 (1995).

To prove that counsel was ineffective by failing to present mitigating proof, the defendant presented the testimony of several witnesses who he maintains should have

been called to testify at the sentencing hearing.[8]   All of these witnesses testified at the hearing on the new trial motion that they had been available and would have been willing to testify at the defendant's trial.   In addition, the defendant introduced into evidence several affidavits from family members, friends, teachers, prison guards, and professionals who had observed, treated or evaluated the defendant.

The defendant's uncle and first cousin by marriage testified to various aspects of the defendant's childhood and adolescence, including his parents' tendency to reject criticism of the twins and to accept the twins' version of disputed events, resulting in the twins' belief that they could get away with anything.   The defendant's father drank heavily at times and had "temper fits" with the twins when they were children.   Generally, however, the parents did not physically abuse the twins, although the parenting style included yelling, cursing and ridiculing the children.   Being overweight, the twins struggled to establish wholesome peer relationships and sometimes associated with the wrong crowd in order to gain acceptance.

Co-workers of the defendant characterized him as being generous, helpful, polite, trustworthy, and committed to his son.   However, they also testified to the defendant's prodigious consumption of alcohol, marijuana, and other narcotics, as well as his fondness for standing over the paint tank at work, huffing the fumes to get a "buzz."

Dr. Murray Smith, an expert in addiction medicine, testified that, based upon

---

[8]We discern from the record a non-contentious approach by the state in allowing the defense to demonstrate its possible proof on the issue of ineffective assistance of counsel. While we think it improper for us to comment specifically, we observe that, during the presentation of the defendant's proof at the hearing on the motion for new trial, the state chose not to challenge evidence even when a good faith challenge was presentable.   We recognize that, because the effectiveness of counsel was raised in the motion for new trial, the hearing on the motion for new trial was a forum for the defendant to present putative or possible evidence and that, were a new trial and/or sentencing hearing to be ordered, the state would be free to challenge the admissibility of proof according to the applicable rules of evidence.   However, appellate review is not fostered where the prosecutor fails to maintain trial-level adversarial intensity during the defendant's presentation of evidence on the issue of ineffective counsel.   We believe the interests of justice are better served where the prosecutor actively seeks to limit the defendant's proof to those matters admissible under the Rules of Evidence.

his review of the defendant's medical records, affidavits of witnesses, lab tests results, and an interview with the defendant, the defendant was toxically poisoned from the tremendous use of multiple drugs. He found that the defendant suffered from morbid obesity since childhood, had developed hepatitis between 1985 and 1987 from intravenous drug use, and that this disease led to cirrhosis. In 1991 the defendant was diagnosed as diabetic. The defendant was dependent upon alcohol, benzodiazepines, speed, amphetamines, and marijuana, but that he also used LSD and took narcotics intravenously. Dr. Smith opined that the various addictions and related problems affected the defendant's mental and emotional functioning, resulting in emotional instability, episodes of anxiety and depression, outbursts of anger, and instances of amnesia. Dr. Smith testified the effect of stimulants taken by the defendant would be to make him hyper, irritable, aggressive, paranoid, and suspicious. The defendant took six to eight times the prescribed dosages of some legend drugs and took ten times more drugs that the average person. In addition to the alcohol and illicit drugs, the defendant abused Halcion, Didrex, Preludin, Fastin, Lonamin, Valium, Phenobarbital, Seconal, Demeral, and Mepergan. Dr. Smith testified that the defendant suffered from synergism, meaning that the combination of drugs he was taking multiplied the effect of each drug. Dr. Smith stated that Denise Bondurant's description of the murder portrayed trance-like behavior characteristic of certain drug abuse. He opined that the defendant would have been unable to inhibit feelings of rage.

Dr. Gillian Blair, a psychologist, testified she conducted a psychological assessment of the defendant. She opined that, at the time of the murder, the defendant was severely disturbed and lacked the capacity to conform his behavior as a function of substance dependency and intoxication. She testified that detrimental parenting techniques and the defendant's obesity and psoriasis resulted in dependency on drugs and alcohol by the age of twelve. These factors arrested the defendant's personality development, explaining why the defendant is impulsive, has difficulty in delaying gratification, and has bad coping mechanisms. Dr. Blair testified the defendant was further destabilized emotionally by the stress of his marriage to Denise and the difficulties of coping with the disabilities of their son. She opined that this stress would fuel the

defendant's drug and alcohol dependency.

In denying the motion for new trial, the trial court disagreed with the claim that the defendant received ineffective assistance of counsel during the sentencing phase. Characterizing Jerry Colley as "one of the most experienced and talented defense attorneys in this State," the trial court yielded to Mr. Colley's strategy to cast "reasonable doubt on the State[']s case," noting that the defense "worked at that theory throughout the trial."

We begin our inquiry by revisiting some of the constitutional dynamics established by the United States Supreme Court. In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the court, in reversing the 11th Circuit's approval of a habeas corpus claim, denied Strickland's claim that, in a capital sentencing proceeding, he had received prejudicial ineffective assistance of counsel. The court noted that, after a guilty plea and in preparation for sentencing, defense counsel spoke with the petitioner's wife and mother but "did not otherwise seek out character witnesses," nor "request a psychiatric examination," nor "present and hence look further for evidence concerning respondent's character and emotional state." Strickland, 466 U.S. at 673, 104 S. Ct. at 2057. The court promulgated its well-known, two-pronged test for assessing claims of ineffective assistance of counsel, applicable in a capital sentencing proceeding as much as at trial, whereby the defendant must show (1) that counsel failed to perform reasonably under the circumstances, Strickland, 466 U.S. at 687-688, 104 S. Ct. at 2064-2065, and (2) that the deficient performance prejudiced the defendant. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

The scrutiny of counsel's performance must be "highly deferential," and the reviewing court must refrain from concluding "that a particular act or omission of counsel was unreasonable" merely because the strategy employed was unsuccessful. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "A fair assessment," the court said, entails making

90

every effort to "eliminate the distorting effects of hindsight" and evaluating the "conduct from counsel's perspective at the time." Id. The court promulgated a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." Id. The court added:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary.
>
> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-991, 104 S. Ct. at 2066. The court acknowledged that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions ...." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

With respect to the prejudice prong of ineffective assistance of counsel, the court said showing that "errors had some conceivable effect on the outcome of the proceeding" is insufficient. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. Rather, the defendant must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In assessing the claim of prejudice, the "court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." Id. The reviewing court must consider the "totality of the evidence before the judge or jury" and should take into account the relative strength or weakness of the evidence supporting the verdict or conclusion. Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

In Strickland, the court held both that Strickland's counsel's performance "cannot be found to be unreasonable" and, even if not reasonable, that Strickland "suffered insufficient prejudice to warrant setting aside his death sentence." Strickland, 466 U.S. at

698-99, 104 S. Ct. at 2070. As to performance, the decision to disdain "more character or psychological evidence" was reasonable. As to prejudice, the court noted that the possibility of psychiatric testimony that the defendant was under "considerable emotional stress that did not give rise to the level of extreme disturbance" created no reasonable probability of a different outcome, especially in light of the "overwhelming aggravating factors" present in that case. Strickland, 466 U.S. at 700, 104 S. Ct. at 2071.

Against the backdrop of Strickland, the Tennessee Supreme Court has recently decided two post-conviction death-penalty cases in which different results were reached, Goad v. State, 938 S.W.2d 363 (Tenn. 1996), reversing the imposition of the death penalty, and Henley v. State, --- S.W.2d ---, No. 01S01-9703-CC-00056 (Tenn. Dec. 15, 1997), affirming the imposition of the death penalty. Both of these post-conviction cases involved allegations of ineffective assistance of counsel preparatory to and during the sentencing phase of a capital case in which the death penalty was imposed.

In Goad, defense counsel wished to offer mitigating proof at the sentencing hearing that the defendant was affected by post-traumatic stress syndrome which resulted from his tour of military duty in Vietnam. The defense attempted to offer the testimony of an expert witness, but the trial court disallowed the evidence. On direct appeal, the Tennessee Supreme Court remanded the matter to allow the defendant to develop a sufficiently detailed offer of proof of the expert's proposed testimony. At the remand hearing, counsel offered neither the testimony of the expert nor the testimony or report of a second doctor who performed a psychological evaluation of the defendant. See State v. Goad, 707 S.W.2d 846, 854 (Tenn. 1986). The trial court found on remand that counsel had not "'actually prepared to offer the testimony of [the expert they attempted to rely upon] and that [this expert] was not prepared to testify that the defendant suffered from post-traumatic stress syndrome.'" Goad, 938 SW.2d at 366. The report of the second doctor was not entered into evidence on remand, even though it reflected that the defendant had a well-documented history of several traumatic, combat-related episodes, sufficient, it seems, to have supported the approval of a service-related disability through the Veterans

Administration.[9]  Goad, 938 S.W.2d at 366-67.  All of this came to light at the post-conviction hearing where, in addition, the diagnosis of post-traumatic stress disorder was affirmed by a third expert who characterized the traumatic events suffered by Goad in Vietnam as "catastrophic."  Id. at 368.

After reviewing the applicable standards for counsel's performance in the context of a capital sentencing proceeding, including the rule that there is no requirement that counsel present mitigating evidence in a capital sentencing proceeding, id. at 369-70, the court reflected upon a teaching of California v. Brown, 479 U.S. 538, 544, 107 S. Ct. 837, 841 (1987), that "'evidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'"  Goad, 938 S.W.2d at 369.

In Goad, our supreme court ruled that counsel's performance was deficient in that counsel "failed to adequately investigate and explore mitigating evidence" relative to the expert's report on the defendant's mental disorder and that, "[m]oreover, counsel's failure to adequately investigate and prepare" for the use of an expert witness and/or the report resulted in counsel's failure to  discern the availability of a second expert who, in fact, was better qualified than the one counsel ineffectually planned to use.  Id. at 370.  The court noted that these errors were compounded by counsel's failure to present the two possible experts as witnesses at the remand hearing.  Such deficient performance was then determined to be prejudicial under Strickland after assessing the following factors: (1) the nature and extent of available mitigating proof; (2) whether substantially similar proof was otherwise presented to the trier of fact; and (3) whether there was strong evidence of aggravating factors so that "the mitigating evidence would not have affected the jury's determination."  Id. at 371.

---

[9]There was conflicting evidence on the issue of whether counsel had this report at trial.  See Goad, 938 S.W.2d at 367.

Applying these factors, the court found that the nature and extent of the proposed mitigating evidence was significant, establishing "a psychological cause and effect between Vietnam and Goad's later behavior." Id. Next, the court found that there was no other evidence before the jury equivalent to the evidence of the psychological disorder which the expert witness(es) could have established. Id. at 373. Finally, the court found that the proposed mitigating proof would have had an impact upon the single aggravating factor found by the jury, that the defendant was "'previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person.'" Id. at 372; see Tenn. Code Ann. § 39-2-203(I)(2) (1982) (repealed 1989). The court reached this conclusion after observing that the onset of the post-traumatic stress disorder was prior to the commission of the violent felonies and could have mollified the effect of those felony offenses as aggravators. Id. at 372-73. Furthermore, the court noted that, even without the mitigating proof, "the jury reported to the trial court they were deadlocked on the question of punishment four hours after retiring to deliberate." Id. at 372-73. Once again, the court referred to the likelihood that Goad would have received a new sentencing hearing after the remand hearing but not for the continued deficient performance of counsel in failing to prepare a proffer of expert evidence for the remand hearing. For these reasons, a new sentencing hearing was ordered.

In Henley, the defendant was convicted of aggravated arson and two counts of premeditated murder. "At trial Henley maintained his innocence and attempted to discredit the prosecution's evidence ...." Henley, --- S.W.2d at ---, slip op. at 4. The defendant testified and denied involvement in the crimes. At the capital sentencing hearing, the defense called the defendant's mother to the stand. In the presence of the jury, she disrupted her own testimony by announcing that she wanted "to talk to" defense counsel. A recess was had, following by the defense resuming its proof by calling the defendant's grandmother, without explaining the failure of the defendant's mother to return to the stand. The grandmother testified to various attributes of the defendant, and the defendant himself testified about a financial reversal that caused him to lose his grandfather's farm. Id., slip op. at 5. The jury sentenced the defendant to death, based

upon finding one aggravating factor in each homicide, that each murder was "'especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.'" Id., slip op. at 7; see Tenn. Code Ann. § 39-2-203(I)(5) (1982) (repealed 1989). In his post-conviction proceeding, Henley alleged his counsel failed to investigate and prepare for the sentencing hearing, including the claims that counsel failed to investigate his mental condition and request an appropriate evaluation.

At the post-conviction hearing, Henley presented two expert witnesses: (1) an attorney, who testified that trial counsel should have used a psychologist to assist in determining if mitigating proof might be feasible for the penalty phase; and (2) a psychiatrist, who interviewed Henley and testified that, at the time of the offenses, he suffered from depression and may have been "'self-medicating' by using alcohol and drugs." Id., slip op. at 11. This latter witness also found that Henley may have been learning disabled and that such a learning disability may have been responsible for Henley's farming failure which, in turn, caused his depression. The trial court dismissed the post-conviction petition. This court found prejudicial ineffective assistance of counsel at the sentencing stage and remanded the case for a new sentencing hearing. The supreme court, however, reversed this court and affirmed the trial court's dismissal of the post-conviction petition.

In addressing the prejudice issue first, see Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, the Henley court first found that any failure of counsel to call as witnesses family members, some of whom testified at the post-conviction hearing about the positive attributes of the defendant, was not prejudicial. Utilizing the first and second prongs of the three-prong test provided in Goad, the court noted that the proposed evidence not only duplicated but perhaps, due to its nature, would have attenuated the poignant testimony of Henley's grandmother. Further, regarding the nature of the proposed testimony, the court acknowledged the principle of California v. Brown that a disadvantaged background is often a proper source of mitigating evidence but expressed concern about the putative witnesses having personal knowledge about Henley's drug use at the time of the crimes.

At this juncture the court declared that "[a]ppellate courts must consider the quality of the proposed testimony rather than the quantity of witnesses when determining whether prejudice has been established." Henley, --- S.W.2d at ---, slip op. at 22.

As to the third prong established in Goad, the Henley court observed that the proof of the aggravating circumstance was strong. Id. The defendant killed an elderly couple. He shot them several times and then burned them by setting fire to their house. The court found ample support for the single aggravator that the crime was especially heinous, atrocious, or cruel, involving torture or depravity of mind. Id., slip op. at 22.[10]

Despite the attainment of disparate results in Goad and Henley, the supreme court did not indicate that it departed from the analysis utilized in Goad. Indeed, Henley is replete with citations to Goad, and it applies the Goad three-prong analysis for determining prejudice under the second Strickland prong. Clearly, the court's view of the facts in Henley warranted a different interpretation and different result than the facts in Goad. With the guidance of these cases, we must determine the effect of the facts in the present case.

We undertake our task in the present case by determining initially whether any deficient performance by trial counsel in failing to prepare and present evidence at the sentencing hearing prejudiced the defendant. See Strickland, 466 U.S. at 697, 104 S. Ct. 2069. For the reasons given below, we conclude that no prejudice was shown and that, accordingly, we need not evaluate counsel's performance under Strickland's first prong.

_____

[10]As to counsel's failure to investigate Henley's mental condition, including the failure to seek an evaluation, the court acknowledged the Goad principle that the attorney has a "duty of inquiry into a client's mental health" when preparing for the penalty phase of a capital trial, but the court amplified some of the teaching of Strickland that "'when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" Id., slip op. at 24 (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066). Henley denied involvement in the crimes and denied using drugs. The court observed, "[T]he evidence for which trial counsel is now faulted for not discovering and introducing would have been inconsistent with the defendant's own testimony and harmful to the defense theory throughout the trial." Henley, --- S.W.2d at ---, slip op. at 24. Thus, the court found that, with respect to the allegations of failing to investigate Henley's mental condition, there was no deficient performance under the first prong of Strickland.

See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

Analyzing the three Goad factors for determining prejudice, we look first at the "nature and extent of the mitigating evidence that was available but not presented." Goad, 938 S.W.2d at 371. As noted above, the asserted mitigating factor in Goad was a recognized mental illness, see American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders § 309.81 (4th ed. 1994), whereas in the present case, an addiction specialist testified only generally that, in combination with the defendant's physiological problems, the use of stimulants would have made the defendant paranoid and suspicious. See State v. Alvin Robinson, Jr., No. 02C01-9608-CR-00280, slip op. at 9 (Tenn. Crim. App., Jackson, Dec. 3, 1997) (For purposes of defeating premeditation and reducing first-degree murder to a lesser grade, "[t]estimony that a defendant suffers from a personality disorder, rather than a mental disease or defect, fails to establish diminished capacity."); see also Strickland, 466 U.S. at 700, 104 S.Ct. at 2071 ("considerable emotional stress that did not rise to the level of extreme disturbance" not sufficient in the face of strong aggravating factors to demonstrate a probability that the use of the evidence would have changed the outcome). Presented in this light, the witness merely described symptoms of the chemical abuse practiced by this particular individual.

Furthermore, our review of the "quality of the proposed testimony," see Henley, --- S.W.2d at ---, slip op. at 22, reveals significant differences in the evidence proposed in Goad and in the present case. While serving in the military in Vietnam, Goad endured several fire fights and, more particularly, experienced the death of three persons close to him. While climbing an electric pole in Goad's stead, one friend was shot, causing him to grab a high voltage wire which propelled him from the pole with his fingers left burned to the wire. In a second incident, Goad and a friend were pinned down by enemy fire. Goad was splattered with what he thought was mud during the fire fight, but he later discovered the substance to be his friend's brains after the friend had been shot through the head. In a third incident, Goad hid in a cellar of his Vietnamese girlfriend's house while the Viet Cong killed her by eviscerating her on the kitchen table above his hiding place.

97

These were the events, coupled with Goad's change in personality and behavior after returning from southeast Asia, that formed the basis for the post-traumatic stress diagnosis. Clearly, this factual background is palpably worthier of mitigation than are the claims of the defendant in the present case that he is disadvantaged by his own self-indulgent lifestyle.

Indeed, upon review of the quality of the proposed evidence in the present case, see Henley, --- S.W.2d ---, slip op. at 22, we cannot escape the conclusion that such evidence does not reveal a "disadvantaged background," nor does it suggest "emotional and mental problems [that make the defendant] less culpable than defendants who have no such excuse." See Brown, 479 U.S. at 544, 107 S. Ct. at 841. There was no showing that positive or redeeming evidence was available, other than the evidence presented through the testimony of the defendant's mother. Cf. Groseclose v. Bell, 130 F.3d 1161, 1170-71 (6th Cir. 1997) (At capital sentencing hearing, counsel failed to use proof that Groseclose had no criminal record, was active in church, and had a positive record of military service.). The proposed evidence, in addition to effectively belying the defendant's claim of innocence, amplifies the defendant's repugnant personal habits. This court has previously recognized that such proof has doubtful effect in "lessening [a defendant's] culpability in the eyes of the jury." Ronald Richard Harries v. State, No. 03C01-9607-CR-00276, slip op. at 16 (Tenn. Crim. App., Knoxville, July 30, 1997), perm. app. denied (Tenn. 1997); see also Rickman v. Bell, 131 F.3d 1150, 1157 (6th Cir. 1997) (finding deficient counsel's performance where he "succeeded in creating a loathsome image for Rickman -- one that would make a juror feel compelled to rid the world of him"). Furthermore, had counsel investigated and discovered a witness such as Dr. Smith or Dr. Blair, counsel would have necessarily considered the daunting prospect that such proposed evidence would have invited cross-examination or rebuttal to show, as  the TDOC report suggests, that the defendant's claims of reduced culpability were themselves manifestations of his propensity to see himself as the victim and to make excuses.

As to the second factor offered in Goad, whether evidence similar to the

proposed evidence had already been heard by the jury, we observe that the jury had heard during the guilt phase about the defendant's prodigious appetite for alcohol and controlled substances. They had not been told about the full panoply of the defendant's diseases or illnesses, or about the combination of effects from the illnesses, their treatments, and illicit chemical use. However, Dr. Smith's testimony about the effects of the defendant's many health problems is only articulated through a lengthy litany of the defendant's staggering indulgences in alcohol, controlled substances and legend drugs. This proof would have starkly counter-vailed against Mr. Colley's chosen portrayal of the defendant as a benign citizen who had for many years held down a steady job, a portrayal that continued into the sentencing phase through the use of the defendant's mother as a witness. While the absence in the case of proof of the type offered by Dr. Smith and to a lesser extent by Dr. Blair counts in favor of prejudice, its viability is diminished by its conflict with the chosen strategy of the defense.

Regardless of the effect of the second Goad factor, the third factor, the competing strength of the aggravating factors, more cogently illustrates that any deficient performance was not prejudicial. See Henley, --- S.W.2d ---, slip op. at 22. Initially we note that, unlike the one aggravating factor found by the Goad jury, the jury in the present case found two. One of these factors was the defendant's previous history of committing a violent offense, in particular, a previous murder. Whereas this statutory factor was the single aggravator in Goad, none of Goad's prior violent offenses was a homicide. The jury in the present case is likely to have accorded great weight to the fact that the defendant was convicted of a prior murder. In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), our supreme court commented that evidence of a previous conviction of a felony involving violence to the person under Code section 39-2-203(I)(2) (1982) (repealed 1989) is an aggravating circumstance that is "more qualitatively persuasive and objectively reliable than others." Howell, 868 S.W.2d at 261. More recently, our supreme court has said,

> [A] defendant's prior conviction for second-degree murder is a significant element to be considered in our analysis [of a death penalty sentence]; in fact, we have affirmed the death sentence in all but one previous case in which a prior violent felony conviction supported the aggravating factor in Tenn. Code Ann. § 39-2-203(I)(2).

99

State v. Boyd, --- S.W.2d ---, No. 02S01-9611-CR-00102, slip op. at 8 (Tenn. Jan. 5, 1998) (commenting that the "remaining case" involved a prior offense of voluntary manslaughter, "a lesser grade of offense than second-degree murder") (citations to cases omitted).[11]  In fact, the defendant in the present case, in a portion of his brief dealing with another issue, tells us that according to probability studies a jury is 520% more likely to impose a death penalty sentence for each of the defendant's prior murder convictions of which the jury is aware.

For the reasons explained above, we hold that the defendant has demonstrated no prejudicial ineffectiveness of counsel in preparing for and conducting the sentencing hearing.

### F. Jencks Violation.

Next, the defendant contends that counsel failed to obtain Jencks material before trial.  This claim is without merit.  Under Tennessee Rules of Evidence 26.2(a), opposing counsel is entitled to move the trial court for the production of Jencks materials only after a witness other than the defendant has testified on direct examination.  The state is under no obligation to provide witnesses' statements prior to trial, even in capital cases.  State v. Taylor, 771 S.W.2d 387, 394 (Tenn. 1989).  Accordingly, trial counsel was not ineffective by failing to request such statements before trial.

### G.  Compensation of Appointed Counsel.

Finally, the appellant submits that trial counsel's representation was affected by the low compensation rate of court-appointed counsel.  This claim is also without merit.  Appointed counsel had a professional responsibility and ethical obligation regardless of the amount of his compensation.  State v. Hoosier, 631

---

[11] In Boyd our supreme court was evaluating the "remaining aggravating factor" prong of its Howell analysis of Boyd's Middlebrooks claim.  For our purposes in the present case, this evaluation of a prior violent felony conviction is sufficiently similar to our present concern with the third Goad factor for determining Strickland prejudice.

S.W.2d 474, 477 (Tenn. Crim. App. 1982); see Tenn. Sup. Ct. R. 8, EC 8-3. We do not find that trial counsel was deterred from carrying out his professional and ethical obligation due to inadequate compensation.

## X. CONSTITUTIONALITY OF THE DEATH PENALTY STATUTES

The defendant raises several challenges to the constitutionality of Tennessee Code Annotated sections 39-2-204 and -206 (1982) (repealed 1989); however, these arguments have been rejected repeatedly by our supreme court. See, e.g., State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994); Brimmer, 876 S.W.2d at 86-88; Cazes, 875 S.W.2d at 268-71; Howell, 868 S.W.2d at 258-59; Smith, 857 S.W.2d at 22-24; State v. Caughron, 855 S.W.2d 526, 542 (Tenn. 1993); State v. Bane, 853 S.W.2d 483, 489 (Tenn. 1993); State v. Evans, 838 S.W.2d 185, 196 (Tenn. 1992); Black, 815 S.W.2d at 179; Barber, 753 S.W.2d at 664, 670-71.

## XI. SECTION 39-13-206(c)(1) REVIEW.

We now attend to this court's duties imposed by Tennessee Code Annotated section 39-13-206(c)(1). Upon our review of the entire record, we conclude that the sentence of death was not imposed in any arbitrary fashion, that the record supports the jury's finding of both statutory aggravating circumstances and the prevalence of aggravating circumstances over any mitigating circumstances, and that the sentence is not excessive nor disproportionate to the penalty imposed in similar cases. Tenn. Code Ann. § 39-13-206(c)(1) (1997).

The evidence supports the jury's reliance upon the defendant's previous conviction of a felony involving the use of violence to the person, Tenn. Code Ann. § 39-2-203(I)(2) (1982) (repealed 1989), and the victim's murder being "especially heinous, atrocious, or cruel in that it involved torture or depravity of

mind." Tenn. Code Ann. § 39-2-203(I) (5) (1982) (repealed 1989). As to factor (2), the proof clearly established the defendant's prior conviction of second-degree murder. As to factor (5), the proof consisting of the defendant's extrajudicial statements shows that the defendant attacked the victim with a child's rocking chair, beating the victim relentlessly for several minutes with sufficient force to reduce the chair to pieces. This proof shows that the murder "involved torture or depravity of mind." Id; see State v. Teal, 793 S.W.2d 236, 251 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989); State v. Porterfield, 746 S.W.2d 441, 451 (Tenn. 1988); see also State v. Hodges, 944 S.W.2d 346, 357 (Tenn. 1997), cert. denied, --- U.S. ---, 118 S. Ct. 567 (1997); see State v. Bland, --- S.W.2d ---, No. 02S01-9603-CR-00032, slip op. at 13-14 (Tenn. Dec. 1, 1997) (applying factor (5) under section 39-13-204(I)(5)(1997)). Clubbing a victim to death is an especially violent form of homicide, and it involved torture at least to the point the victim became unconscious. Moreover, the desecration of the victim's body in an attempt to conceal the crime was reprehensible. See State v. Morris, 641 S.W.2d 883, 890 (1982). Furthermore, the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. "The weight given aggravating and mitigating circumstances is entirely with the province of the jury. The jury determines whether or not mitigation exists and whether the aggravating circumstances outweigh mitigation beyond a reasonable doubt." Bland, --- S.W.2d at ---, slip op. at 15. In the present case, the presence of aggravating circumstance (2) alone supports the jury's finding that the aggravating circumstances prevail. See Boyd, --- S.W.2d at ---, slip op. at 8; Howell, 868 S.W. 2d at 261.

We are guided in our proportionality review under section 39-13-206(c) (1)(D) by our supreme court's opinion in Bland. Our proportionality review "'presumes that the death penalty is not disproportionate to the crime in the traditional [Eighth Amendment] sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate

102

to the punishment imposed on others convicted of the same crime.'" Bland, --- S.W.2d at ---, slip op. at 16 (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984)).   Through utilizing a "precedent-seeking approach [which] compares the case before [the court] to other cases in which the defendant[ ] [was] convicted of the same or similar crimes by examining the facts of the crimes, the characteristics of the defendants and the aggravating and mitigating factors involved," Bland, --- S.W.2d at ---, slip op. at 21, our aim is to "eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty." Id., slip op. at 22.  The pool of cases to be considered consists of first-degree murder cases in which the jury considered the death penalty.[12] Id., slip op. at 24-25.  In conducting the review, the court should consider, in addition to aggravating and mitigating circumstances used in other cases, relevant factors which include:

> (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation of the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims.

> Also evident from our reading of our prior cases are several criteria relevant to a comparison of the characteristics of defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation.

Id., slip op. at 26-27 (citations omitted).  However, we are reminded by our supreme court that proportionality review is not a "rigid, objective test" that utilizes

_____

[12]With information currently available to this court, our ability to discern cases in which the jury considered and rejected the death penalty is limited.  We find that appellate opinions in life-sentence murder cases often do not reflect whether the jury was asked to impose the death penalty.  Moreover, Tennessee Supreme Court Rule 12, in promulgating a form for the trial judge to use in submitting factual information about murder cases in which death penalties or life sentences were imposed, does not elicit, with one exception, whether the jury considered and rejected the death penalty.  The exception is a question which, when answered in the affirmative, discloses if a life sentence was the result of a hung jury.

103

"mathematical or scientific techniques." Id., slip op. at 28. A reviewing court relies upon the "experienced judgment and intuition of its own members." Id. Finally, a sentence is not disproportionate unless "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id.

Of the enumerated factors pertaining to the crime in the present case, the means and manner of the clubbing death are important factors. The defendant's apparent motive was grounded in nothing more redeeming than misguided anger over his perception that the victim stole his wallet, exacerbated by the perception that the victim cheated while the two were playing cards. The victim was not a member of any ethnic or minority group and was neither of an immature age nor infirm because of advancing years. At the time of the killing, both men had consumed alcohol. Although the issue of premeditation was contested, the jury found the murder was premeditated. Any claims to provocation the defendant might have made should have been barred solely on anger, but any such claims would have been belied by his prior threats to harm the victim. There were no victims of the defendant's criminal acts other than the decedent-victim.

Of the factors pertaining to the defendant, the defendant's prior criminal record, significantly, included a previous conviction of second-degree murder. The victim and the defendant were of the same race, gender, and general age grouping. The defendant suffered from various emotional and physical health problems, many of which emanated from the presence of many forms of chemicals he had injected into his body. The defendant was the sole perpetrator of a crime for which he provided no assistance to the police and showed absolutely no remorse. His knowledge of the helplessness of the victim and his capacity for rehabilitation are, as far as this court is concerned, unknown.

With these dynamics in mind, we have examined the pertinent cases

that have progressed through the Tennessee appellate courts since 1979. We find the cases summarized below to be instructive. In each case where the death penalty was imposed, it was not found to be disproportionate.[13]

In Morris, the victim's skull was crushed, and then his body was submerged in water then dragged through underbrush to be concealed in a remote location. The defendant was 26, the victim was 27. The defendant was previously convicted of manslaughter. The jury found the presence of aggravating factors (2) and (7). Morris, 641 S.W.2d at 883. In affirming the conviction and sentence, the supreme court observed that Morris robbed the victim and then "the perpetrator of the brutal murder in this case attempted to conceal the body and the evidence of the crime." Id. at 890.

In State v. Caldwell, 671 S.W.2d 459 (Tenn. 1984), Caldwell and the victim were engaged in a drinking bout that erupted into violence when the victim threw whiskey into Caldwell's face. Caldwell then fired a shotgun twice into the victim's head and then proceeded to conceal the body. The defendant was 34, the victim 31. Both men were white. The jury found the presence of aggravating factor (2), based upon the defendant having been convicted previously of first-degree murder. This factor outweighed two mitigating factors.

In State v. Martin, 702 S.W.2d 560 (Tenn. 1985), overruled on other grounds, State v. Brown, 836 S.W.2d 530 (Tenn. 1992), our supreme court reversed the conviction due to Sandstrom error, but it overruled all other assignments of error presented by Martin. Martin, 671 S.W.2d at 565. The proof showed that Martin

---

[13]Statutory aggravating and mitigating circumstances, currently set forth in Tennessee Code Annotated section 39-13-204(I) and (j) were formerly contained in now repealed Code sections, such that the aggravating and mitigating factors used in the cases summarized in the succeeding paragraphs of this opinion, although identified generally by the same number, relate in each case to the statute that governed the crime in that case. Tennessee Code Annotated section 39-2407 (Supp. 1979) was repealed in 1982, whereupon the succeeding provision became section 39-2-203 (1982). This section governed the homicide in the present case. It was repealed and succeeded in 1989 by section 39-13-204.

struck the victim with a pistol and then fired a shot into the victim's left ear. The supreme court acknowledged that on the proof presented the sufficiency of the evidence as to premeditation and malice was a close question. The defendant was 33, the victim 45. Both men were black. The only aggravating factor found was factor (2), based upon the defendant having been convicted previously of second-degree murder. Id. at 565.

In State v. Johnson, 698 S.W.2d 631 (Tenn. 1985), the defendant was convicted of murdering the victim by clubbing him with a heavy candleholder. The defendant was 27, the victim 84. Both men were white. "The jury found aggravating circumstances" (2) and (7). Whereas factor (7) was found because the killing was perpetrated during an alleged robbery, factor (2) was based upon a 1975 second-degree murder conviction. Id. at 632.

In State v. Sparks, 727 S.W.2d 480 (Tenn. 1987), the defendant killed the victim, a deliveryman, by shooting him three times. The defendant was 30, the victim 56. Both men were black. The jury found the presence of aggravating factors (2) and (7). The use of factor (2) was based upon previous convictions of "three other felonies which involved the use of threat of violence to the person." Id. at 480.

In State v. Poe, 755 S.W.2d 41 (Tenn. 1988), the defendant participated in the robbery and murder of the victim. The crimes were committed after the defendant and the victim had engaged in a drinking bout. The victim was beaten to death. Both men were 18, white, and enlisted in the Armed Services. Aggravating factors (2), (5), and (7) were found. The mitigating factors listed by the trial court were (1), (7), and (8). Aggravating factor (2) was based upon a prior conviction of assault with a knife.

In State v. Sutton, 761 S.W.2d 763 (Tenn. 1988), the defendant and victim were correctional facility inmates. The victim died after being stabbed 38

times. The defendant was 23, but the age of the victim was not provided. Both men were white. The jury found the presences of aggravating factors (2), (5), and (8). The use of factor (2) was based upon the defendant's prior conviction of first-degree murder.

In State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the defendant beat his rape victim with a piece of 2"x4" lumber. She died from the wounds. The defendant was male, 24, the victim 22, a female. Both were white. In the face of several listed mitigating factors, both statutory and non-statutory, the jury found the presence of aggravating factors (2) and (7) outweighed the mitigating factors. The supreme court found that factor (7) was misapplied based upon the holding in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992); however, in Nichols the court found the error harmless beyond a reasonable doubt, concluding that "the sentence would have been the same had the jury given no weight to the invalid felony-murder aggravating circumstances." Nichols, 877 S.W.2d at 737-39. The use of factor (2) was predicated upon "five prior convictions for aggravated rape." Id. at 737.

In State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994), the defendant tied the victim to a tree and choked him to death with a wire. The defendant then stole the victim's truck. The defendant was 28, the victim 37. Both men were white. The first-degree murder conviction was based upon premeditation, not felony-murder, and the sole aggravating factor found by the jury was (7), the felony-murder factor.

In State v. Hodges, 944 S.W.2d 346 (Tenn. 1997), cert. denied, --- U.S. ---, 118 S. Ct. 567 (1997), the defendant, a homosexual prostitute, accompanied the victim, who sought the defendant's services, to the victim's home. There, the defendant bound the victim's hands and feet and, with the help of a female accomplice, removed property from the victim's home. Afterward, despite the victim's pleas for his life, the defendant strangled him with a rope. The defendant was 24, the victim 37. Both men were white. Several non-statutory

mitigating circumstances were listed by the trial court, and the jury found the presence of aggravating factors (2) and (5). The supreme court found that factor (5) was supported by the proof, as was factor (2) which was based upon prior convictions for armed robbery, attempted kidnapping, robbery, and murder.

State v. James Lloyd Julian II, No. 03C01-9511-CV-00371 (Tenn. Crim. App., Knoxville, July 24, 1997), pet. perm. app. filed (Tenn. Oct. 30, 1997), is a case where the jury, after convicting Julian of first-degree murder, declined to impose the death penalty and imposed instead a life sentence without parole. The victim was a female child, age three. Julian killed the victim by strangulation during the perpetration of rape. Id., slip op. at 5. The defendant offered expert testimony both at the trial and the sentencing hearing to show that the defendant, a "polysubstance abuse[r]" and himself a victim of sexual abuse as a child, was afflicted with a depressive disorder, a mixed personality disorder, and chronic alcoholism. Id., slip. op. at 8, 37-38. The jury found as aggravating circumstances that the "victim was under twelve (12) years old and that the murder was especially heinous, atrocious, or cruel," Tenn. Code Ann. § 39-13-204(I)(1), (5) (1990); however, the jury found the aggravating circumstances did not outweigh the mitigating circumstances. Id., slip op. at 9.

In totality these cases illustrate that the death sentence imposed in the present case is neither arbitrary nor disproportionate. As pointed out above, the means and manner of the murder are cognizable under factor (5). Hodges, 944 S.W.2d at 357. Moreover, the penalty has been imposed on several occasions when a male defendant murdered a male victim of the same race and same general age grouping, especially when aggravating factor (2) was present. As mentioned above, our supreme court in Boyd assigned particular significance to a prior violent felony conviction. In conducting a Howell analysis, see State v. Howell, 868 S.W.2d 238 (1993), of a Middlebrooks claim, the court compared the impact of factor (7) with that of factor (2) and concluded that Boyd's prior conviction for second-degree

108

murder weighed heavily in the balance in rendering harmless any <u>Middlebrooks</u> error. It said, "Although the statute assigns no relative importance or weight to the aggravating circumstances, we observed that a prior felony conviction 'may be more qualitatively persuasive and objectively reliable' than other factors." <u>Boyd</u>, --- Tenn. ---, slip op. at 8 (quoting <u>Howell</u>, 868 S.W.2d at 261).

## XII. CONCLUSION

We have carefully considered the appellant's contentions as to alleged errors occurring during the guilt phase and the sentencing phase of the trial. We fail to find reversible error and affirm the appellant's convictions and sentences.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
PAUL G. SUMMERS, JUDGE

_____
DAVID G. HAYES, JUDGE